LOREN F. BREWER *vs.* RALPH HAMOR and others.

Hancock. Opinion April 2, 1891.

*Illegitimacy. Adoption. Inheritance. R. S., c. 75, § 3.*

By R. S., 1883, c. 75, § 3, an illegitimate child born after March 24, 1864, is the heir of parents who intermarry; and such child, born at any time, is the heir of his mother, and of any person who acknowledges himself to be his father in a writing signed in the presence of and attested by a competent witness; and if his parents intermarry and have other children before his death, or his father so acknowledges him, or adopts him into his family, he shall inherit from his lineal and collateral kindred, and they from him, as if legitimate; but not otherwise.

In an action brought to determine the title to the father's real estate, after his decease, it was *held :*

1. That the provisions of statute in force at the time of his decease must determine the rights of the heirs to the inheritance of his real estate.

2. That, inasmuch as the illegitimate child in this case was born prior to 1864, and there was no acknowledgment in writing by the father, the rights of the parties must be determined by the remaining portion of the section of statute in question.

3. That under that, the first requisite to enable an illegitimate child to inherit from the father, is an intermarriage of the parents.

And in addition thereto one of the following things must be shown to have taken place, viz. :

1. Either that his parents have had other children before his death; or :

2. That his father has acknowledged him in writing; or :

3. That the father has adopted him into his family.

Where the illegitimate child has been legitimatized in accordance with the terms of the statute, such child inherits, "as if legitimate;" and in case of the death of such child leaving children, such children of the illegitimate inherit from their grandfather—the father of the deceased illegitimate—such portion as their mother would have inherited from his estate.

The case of *Hunt* v. *Hunt*, 37 Maine, 333, distinguished.

REPORT, ON FACTS AGREED.

The facts are stated in the opinion.

*Wiswell, King and Peters*, for the plaintiff.

The facts are undisputed. The sole question is, can the issue of this daughter, Isephine, inherit from her father any part of the real estate? They can not unless they bring themselves within the provision of some positive statute enactment. *Cooley* v. *Dewey*, 4 Pick. 93, 95; 1 Bl. Com. 459. Statute enabling them to inherit should be strictly construed. *Dwelly* v. *Dwelly*, 46 Maine, 377; *Pratt* v. *Atwood*, 108 Mass. 41. Counsel also cited: *Hunt* v. *Hunt*, 37 Maine, 333, 334; *Curtis* v. *Hewins*, 11 Met. 294; *Kent* v. *Barker*, 2 Gray, 535.

*W. P. Foster*, for the defendants, cited: *Monson* v. *Palmer*, 8 Allen, 551; *Collins Granite Company* v. *Devereux*, 72 Maine, 422; *Winslow* v. *Kimball*, 25 Maine, 493; *Gibson* v. *Jenney*, 15 Mass. 205; *Kent* v. *Barker*, 2 Gray, 535, 537; *Barden* v. *Crocker*, 10 Pick. 383; *Reynolds* v. *Hanrahan*, 100 Mass. 313; *Com.* v. *Bralley*, 3 Gray, 457: *Whitney* v. *Whitney*, 14 Mass. 88; *Bull* v. *Loveland*, 10 Pick. 9, 13; *Somerset* v. *Dighton*, 12 Mass. 383; *White* v. *The Mary Ann*, 6 Cal. 462; *United States* v. *Freeman*, 3 How. (U. S.) 556; *Smith* v. *Chase*, 71 Maine, 164; *Church* v. *Crocker*, 3 Mass. 17, 21; *Com.* v. *Munson*, 127 Mass. 459, 461; *Com.* v. *Bailey*, 13 Allen, 541, 545; 2 Kent, 213; 3 Wash. R. P. (4th ed.) 41; *Ash* v. *Way*, 2 Gratt. (Va.) 203; *Safford* v. *Houghton*, 48 Vt. 236; *Miller* v. *Miller*, 18 Hun, (N. Y.) 507; *Hawbecker* v. *Hawbecker*, 43 Md. 516; *Drain* v. *Violett*, 2 Bush. 155; *Barwick* v. *Miller*, 4 Desaus. Eq. 434; *Stover* v. *Boswell*, 3 Dana, 233; *Loring* v. *Thorndike*, 5 Allen, 257, 263; *Killam* v. *Killam*, 39 Pa. (St.) 120; *Cooley* v. *Dewey*, 4 Pick. 93; *Crane* v. *Crane*, 31 Iowa, 296.

FOSTER, J. The plaintiff, Loren F. Brewer, brings this writ of entry against the defendants, four children of Isephene who was an illegitimate child of the plaintiff's father and mother, (Otis Brewer and Rebecca Ann Higgins,) who were married on the 21st day of February, 1847.

On the 26th day of January, 1847, less than one month prior to said marriage, Isephene, the illegitimate child, was born, and on April 7, 1853, the plaintiff in this suit was born.

The infant child, Isephene, was brought into the room immediately after the ceremony of the marriage of its parents, and was adopted into and brought up in the family of her father, who many times, before witnesses, and at the time of the marriage, verbally acknowledged her to be his daughter. She was never acknowledged in writing by him to be his child. No difference was made by the father in his treatment of the two children, Isephene and this plaintiff.

Isephene was married, and died March 7, 1883,—the defendants being her four children.

The father of Isephene and this plaintiff died April 20, 1884, intestate, leaving the real estate claimed by the plaintiff in this action. The mother died a year later.

This action is brought to test the title to the real estate left by Otis Brewer, and the question involved is whether the issue of Isephene can inherit any portion thereof. To do so they must bring themselves within the provisions of same positive statute enactment. At common law an illegitimate child has no inheritable blood, and no rights to property can be traced through him.

In this State, the provisions of statute in force at the time of the decease of a person intestate must determine the rights of the heirs to the inheritance or descent of his real estate. The decision in this case, then, depends upon, and we must be governed in our determination as to the respective rights of these parties by the proper construction of the statute in relation to the rights of illegitimate children in force at the time of Otis Brewer's death, or R. S., 1883, c. 75, § 3, which is as follows : "An illegitimate child born after March twenty-fourth, eighteen hundred and sixty-four, is the heir of parents who intermarry ; and such child, born at any time, is the heir of his mother, and of any person who acknowledges himself to be his father in a writing signed in the presence of and attested by a competent witness ; and if his parents intermarry and have other children

before his death, or his father so acknowledges him, or adopts him into his family, he shall inherit from his lineal and collateral kindred, and they from him, as if legitimate ; but not otherwise."

Inasmuch as the illegitimate child in the present case was born prior to 1864, the rights of the defendants must be determined by the construction and meaning of the remaining portion of the section in question. In arriving at the proper construction and the true meaning of this statute we should seek to ascertain the intention of the legislature, and when that is found it should govern. To ascertain this, the court may look not only to the object in view and the remedy intended to be afforded, but to the whole history of legislation on the subject, whether repealed or unrepealed. *Com.* v. *Munson*, 127 Mass. 461. It is always to be presumed that the legislature intended the most beneficial construction of their acts when the design of them is not manifestly apparent. Notwithstanding the well-established doctrine that a statute made in derogation of the common law is to be construed strictly, it is equally well settled that it is to be construed sensibly, and with a view to the object aimed to be accomplished by the legislature. These principles are but different illustrations of the rule which courts repeatedly act upon, and which is too familiar to require any citation of authority to sustain it, that the meaning of the legislature may be extended beyond the precise words used in the law, from the reason or motive upon which the legislature proceeded, from the end in view, or the purpose which was designed.

Examining the statute, then, in the light of these principles, and in view of the fact that there is, in this case, no written acknowledgment of the paternity of the child, the rights of these defendants must be determined by the third clause of the section under consideration, which reads thus : "And if his parents intermarry and have other children before his death, or his father so acknowledges him, or adopts him into his family, he shall inherit from his lineal and collateral kindred, and they from him, as if legitimate."

The first requisite to enable an illegitimate child to inherit

under this clause, is, that his parents intermarry. Under the civil law this alone was sufficient to enable him to inherit from his father. But under the statute it is not enough, and one of three additional things, equal in importance in determining the heirship, must be shown to have taken place; either (1,) that his parents have had other children before his death; or (2,) that his father has acknowledged him in writing; or (3,) that the father has adopted him into his family.

Intermarriage of the parents being the first requisite, the three additional elements have been made equivalents, and the concurrence of either one of them with intermarriage is legally sufficient to enable the illegitimate to inherit. It is not necessary that, in addition to intermarriage, all these elements should concur before the illegitimate is entitled to inherit.

In the present case, more than the conditions required by the statute have been fulfilled. The parents of Isephone, under whom the defendants claim, intermarried and had another child before her death; and in addition to that her father adopted her into his family. With these conditions fulfilled, the statute expressly provides that she shall inherit from her lineal and collateral kindred, and they from her, as if legitimate. Her lineal kindred are those from whom she traces her descent, and the line must begin with her father. *Hardy* v. *Sprowle*, 32 Maine, 312, *note*. It is not her lineal kindred on her mother's side. There is no such limitation. Neither does the pronoun "his"—or her—refer as its antecedent to the father or mother, but to the illegitimate. By representation she is to inherit from the brothers and sisters of her father, her collateral kindred. It is not to be supposed that the legislature intended to impose a severer condition to enable her to inherit from her own father, than from her uncles or other collateral kindred, nor does the language of the statute support any such inference. A different interpretation of the statute, which would require stronger evidence of affiliation and a more formal acknowledgment to make a child the heir of his own father, than to make that child the heir of his father's brothers and sisters, would be unreasonable.

It is unnecessary to wander outside of the statute itself to come to the unavoidable conclusion that she, under whom the defendants claim, must inherit from her father. Any other construction would seem incongruous, arbitrary, and an exceptional distortion of language that is plain, consistent and harmonious. It seems to have been the intention of the legislature in enacting this statute, in the form in which it existed at the death of the father of this child, to make illegitimate children, adopted and recognized by the father, joint heirs with their more fortunate brothers and sisters, born of the same mother under the sanction of marriage. This construction is not only reasonable, but just; it is in the direction of the march of modern legislative enactments, not only in this but other states and countries, and in the direction of humanity and liberality. It is true that the English law has always strongly opposed the whole doctrine of legitimation, and most English jurists have stubbornly maintained the superiority of their own maxims, which place the immutability of the marriage relation above the tender promptings of humanity towards innocent and unoffending sufferers. But by the civil and canon law, legitimation by subsequent marriage placed the illegitimate child to all intents and purposes on the same footing as the subsequent offspring born in lawful wedlock. This system of legitimation, so abhorrent to the common law of England, but so consistent with justice, has been introduced into Scotland, and prevails, with different modifications, in the codes of France, Spain, Germany, and most other countries in Europe. It is founded upon considerations of equity and justice, and, as maintained by the Scotch courts, it tends to advance what was at first irregular and injurious to society, into the honorable relation of lawful matrimony, preventing those unseemly disorders in families which are produced where the elder-born child of the same parents is left under the stain of bastardy, and the younger one enjoys the status of legitimacy. *Munro* v. *Munro*, 1 Rob. H. L. Scotch App. 492.

This doctrine of the civil law has found great favor and been adopted in many of the states of the Union. The history of

legislation upon this subject in this country shows a continual advancement, and a breaking away from those antiquated English maxims, in the direction of human progress and liberal thought. This is true not only in relation to legislation in other states but to legislation in this state, and the statute under consideration.

The construction which we have given is warranted by the language used. The *first* clause of the section relates to illegitimate children born after a certain date, and none others; the *second* clause prescribes the manner in which the guilty father may make his illegitimate child his heir, where no marriage has taken place between the parents; and the *third* clause adds another requirement to the intermarriage required in the first clause, and under these circumstances the illegitimate child, born at any time, shall inherit from his kindred, *as if legitimate.*

The statute as first enacted in 1838, afterwards incorporated into the revision of 1841, existed until 1852. By c. 266, of that year, the legislature directed that the statute should be so construed, "as to make illegitimate children therein mentioned heirs of the father, as well as of the brothers and sisters, and in the same manner, as if they had been born in lawful wedlock, whenever their parents shall have intermarried and acknowledged them or adopted them."

This statute should not be overlooked, for it has never been repealed, and is entitled to consideration upon the question of legislative intention. "To discover the true meaning of a statute," says Chief Justice Parsons, "it is the duty of the court to consider other statutes made *in pari materia,* whether they are repealed or unrepealed;" *Church* v. *Crocker,* 3 Mass. 21. "And if it can be gathered from a subsequent statute *in pari materia* what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute." *United States* v. *Freeman,* 3 How. (U. S.) 565.

The same construction seems to have been given to this statute

by BARROWS, J., in *Inhab. of Livermore* v. *Inhab. of Peru*, 55 Maine, 472. In that case, speaking of the illegitimate child, he says : "Though illegitimate by birth, in consequence of the subsequent intermarriage of her parents, the birth of other children, and her own adoption into the family, is to be deemed legitimate."

But the plaintiff's contention is against the construction of this statute as we now view it, and he relies upon the case of *Hunt* v. *Hunt*, 37 Maine, 333, as sustaining his position.

While it is not necessary to criticise the correctness of that decision, inasmuch as it was based upon the statute of 1841, it is proper to remark that the decision went to the extreme limit of strict construction. It was decided under a statute entirely different, in our view, from the law governing the present case. The legislative declaration of heirship from the father by an illegitimate, (Act of 1852, c. 266,) was not considered by the learned Judge who drew the opinion as having any legitimate bearing upon the decision in that case, inasmuch as the father of the illegitimate had deceased, and the rights of the other children had become vested, prior to its enactment. There was a strong dissenting opinion in that case, even as the law then stood. If we compare the statute of 1883, with that under which the case of *Hunt* v. *Hunt*, was decided, our belief is strengthened that the change in the statutes was made, not for the purpose merely of a more condensed and clearer statement of the law as it existed in the statutes of 1841, but for the purpose of conferring upon the illegitimate the right of inheritance denied in the last mentioned case. The legislative declaration of heirship from the father has been added where before it did not exist. The negative form of expression in the last clause of the former statute has been changed to an affirmative ; *not so much is now* required. Where before, in addition to the intermarriage of parents, it was necessary that other children should be born *and* the illegitimate adopted into the family of his father, the law now requires, besides such intermarriage, the birth of other children *or* adoption into the family. The clause is more general, the wording more simple and comprehensive. The pronoun

"his," preceding "kindred," which in the former statute referred to the father as its antecedent, now refers to the illegitimate. "He,"—the illegitimate,—"shall inherit from *his* lineal and colleteral kindred, and they from him, as if legitimate." The right of the father to inherit from his illegitimate child is here given, —no where else is it given.

The death of the illegitimate previous to the death of the father could make no difference in the right of inheritance, under the laws of descent. It would make no difference in the case of a legitimate child; and this statute plainly says that the illegitimate, legitimatized according to its terms, shall inherit "as if legitimate."

If, then, Isephene was, at the time of her decease, a lawful heir to her father, her children, the defendants in this case, inherit one half their grandfather's estate. It is well settled that even bastards transmit property to their own offspring. That was the rule even at common law. And in *Ash* v. *Way*, 2 Gratt. (Va.) 203, it was held that where a bastard married and died, leaving a legitimate child, and the father of the bastard had in her lifetime recognized her as his child, the child of the bastard may inherit through her from its grandfather.

But it is claimed by the plaintiff that, even if the court should hold that Isephene had been legitimated, and thereby, might inherit from her father, these defendants, her legitimate children, can not inherit through her from their grandfather, there being no provision of statute, allowing them to do so; and the case of *Curtis* v. *Hewins*, 11 Met. 294, is cited and relied upon as sustaining this position. This is altogether too strict a construction to be applied to the statute in the present case. The decision in that case was based upon a statute very different from that by which this case is governed. The opinion is very brief, embracing but two lines; the head note is misleading, as it states only half the provision of statute, and omits the clause by which the court was evidently governed in its decision, and which in express terms prohibited the grandchild from inheriting through the mother any part of the grandfather's estate, viz: "but he shall not be allowed to claim, as representing his mother, any

part of the estate of any of her kindred, either lineal or collateral." *Kent* v. *Barker*, 2 Gray, 537.

While the opinion, therefore, in *Curtis* v. *Hewins*, *supra*, may be regarded as a correct exposition of the law in that jurisdiction, and by the tribunal rendering it at the time it was given, it can not be considered as authority governing this court in the interpretation of a statute from which such express prohibition has long since been eliminated, and so apparently humane and remedial as this seems to be.

The defendants were born legitimate; the mother was made legitimate through the law; thus both are made whole. "This relaxation in the laws in so many states," says Chancellor Kent, "of the severity of the common law, rests upon the principle that the relation of parent and child, which exists in this unhappy case, in all its native and binding force, ought to produce the ordinary consequences of consanguinity." 2 Kent Com. 214. By the statute the illegitimate, after certain conditions have been fulfilled by the father as we have herein mentioned, is made to inherit from his kindred, and they from him, as if legitimate. If these defendants are not to be considered as inheriting through their mother from her father what she herself might have inherited, then the "ordinary consequences of consanguinity" spoken of by Chancellor Kent, become shorn of half their meaning. To be sure, such considerations, while they ought not to change the construction of a statute whose meaning is plain and free from doubt, may, as in the history of legislation on the same subject, be of aid in determining the intention of the law makers, and throw light upon the meaning and application of terms used. *Smith* v. *Chase*, 71 Maine, 165; *Eaton* v. *Green*, 22 Pick. 531.

In accordance with the stipulation in the case the entry must be,

> *Judgment for demandant for one half undivided of the real estate described in his writ, and for no more, without costs.*

PETERS, C. J., LIBBEY, EMERY, HASKELL and WHITEHOUSE, JJ., concurred.