## In re GARR'S ESTATE.

No. 1724. Decided August 24, 1906 (86 Pac. 757).

1. BASTARDS—PATERNITY—EVIDENCE.—Evidence reviewed, and *held* to establish that intestate was the natural father of a son under whom petitioners claimed the right to share in intestate's estate.

2. STATUTES—CONSTRUCTION.—Under the express provisions of Revised Statutes 1898, section 2489, statutes in derogation of the common law are to be liberally construed, with a view to effect the objects thereof and to promote justice.

3. BASTARDS — LEGITIMATATION — RIGHT OF INHERITANCE. — Revised Statutes 1898, section 10, provides that the father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such with the consent of his wife if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. Section 2833 declares that every illegitimate child is an heir of the person who acknowledges himself to be the father thereof, capable of inheriting as if born in wedlock. *Held*, that where a bachelor acknowledged an illegitimate child to be his own, took him into his family, and reared him as his own child, the child thereby acquired inheritable blood, which he could transmit to his children, so that, on the illegitimate's death before his father, his children were capable of inheriting from the latter.

Appeal from District Court, First District; T. D. Lewis, Judge.

Judicial accounting by A. E. Cranney, as administrator of John T. Garr, deceased. From an order directing distribution of intestate's estate to his collateral next of kin, as against the heirs of a son of intestate born out of wedlock, they appeal.

REVERSED.

*George Q. Rich* and *James C. Walters,* for appellants.

*Frank D. Nebeker* and *J. D. Murphy,* for respondent.

APPELLANT'S POINTS.

The rule of law, that statutes in derogation of common law, should be strictly construed, has been by statute expressly abrogated in Utah since 1884 as to all civil matters. (Laws of Utah, 1884, p. 154; sec. 2489, Rev. Stat. 1898.) They are to be liberally construed. (*In re Jessup's Estate*, 21 Pac. 979.)

In the very learned opinion, in the case of *Dickenson's Appeal*, which we commend for the perusal of the court, upon the subject of illegitimacy, it is said, "The general tendency seems to be one of liberality." (19 Am. Rep. 653, 42 Conn. 491; *Brewer v. Hamor* (Me.), 22 Atl. 163.)

Declarations concerning pedigree are an exception to the rule as to the admission of hearsay evidence, but they must be confined to the declarations of those related by blood or marriage to the person whose parentage is in question." (Jones, Evidence, No. 316; Greenleaf, Evidence, No. 103; *DeHaven v. DeHaven*, 77 Ind. 236.)

It is admitted by the record in this case that Johnny Garr was born a bastard child. His only relatives of the blood therefore would have been the members of his mother's family and it cannot be contended that William Garr was related in any way by marriage to Johnny Garr, and being neither related by blood or marriage his statement to the witness Riggs ought to have been excluded by the court. (*Blackburn v. Crawford's Lessee*, 3 Wall. 175, 18 L. Ed. 196; *Elliott v. Piersol*, 1 Pet. 326, 7 L. Ed. 164.)

RESPONDENT'S POINTS.

"Laws on the subject of descent, dower, curtesy, etc., are subject to the control of the Legislature and estates derived under such laws are controlled by the laws in force at the time of the death of the person from whom they are derived." (*Hanson v. Moore*, 104 Ill. 403; *Armstrong v. Lear*, 33 U. S. [8 Pet.], 52 L. Ed. 863; *Brewer v. Hamer* [Me.], 22 Atl. 161; *Carroll v. Carroll*, 20 Tex. 731.)

The section of the statute refers only to the child of a deceased; there is nothing in it with reference to children's children; there is nothing that can be tortured into a claim that our Legislature sought to confer any benefit upon grandchildren. (*Curtis v. Hewins*, 52 Mass. [11 Mut.] 294; *Steckel's Appeal*, 64 Pa. St. 493.) The authorities are all to the effect that the acknowledgment of a bastard child must be subsequent to the passage of law conferring inheritable rights upon him. (*Stevenson's Heirs v. Sullivant* [U. S.], 5 Wheat. 207; *Hartinger v. Ferring*, 24 Fed. 15; *Brown v. Delmarde*, 3 Kan. 35; *Appeal of Gruff*, 58 Pa. St. 55; *Appeal of Neil*, 92 Pa. St. 193.)

The whole tenor of Kentucky decisions and the settled law of that state being that children of bastards cannot inherit from the ancestors of that bastard, he dying before the ancestor. (*Berry v. Owen's Heirs*, 68 Ky. 452; *Allan v. Ramsey's Heirs*, 58 Ky. 635; *Jackson v. Jackson*, 78 Ky. 390; *Sutton v. Sutton*, 87 Ky. 216.)

As supporting the doctrine that declarations of deceased members of either branch of a family, whose relationship is in issue are admissible, we cite the following: 16 Cyc., p. 1228; *Crawford v. Blackburn*, 17 Md. 49; *Northrop v. Hale*, 76 Me. 306, 49 Am. Rep. 615; *Fowler v. Simpson*, 23 Am. St. Rep. 371.

BARTCH, J.

John T. Garr died intestate in Cache county, Utah, on the 30th day of October, 1900, and left an estate consisting of real and personal property. On December 29, 1900, A. E. Cranney, one of the respondents herein, was appointed administrator of the estate, and has since been acting as such officer. On June 1, 1903, the administrator filed a petition for distribution of the estate, in which he alleged that the brothers and sisters and issue of the deceased brother and sister are the sole heirs at law of the deceased, and prayed that the decedent's property be distributed to them, that the administration be closed, and that he be discharged as administrator. On June 25, 1903, Elizabeth Ann Garr, the general

guardian of the persons and estates of Merel, Mila, Johnnie D. and Deloris Garr, they being the legitimate minor children of the petitioner and one Johnnie Garr, deceased, filed an answer and cross-petition, in which she denied that the collateral kin, mentioned in the administrator's petition, are heirs at law of John T. Garr, deceased, and alleged that Johnnie Garr, deceased, the father of the minor children mentioned, was the illegitimate son of the decedent, John T. Garr; that the minors are the decedent's grandchildren, his only lineal descendants, and his sole and only heirs at law— and prayed that the decedent's estate be distributed to them. Both petitions were heard together, and the cause was finally submitted for decision, and by the court taken under advisement on July 10, 1903; and on December 19, 1904, the court found and held that the collateral kin are the sole and only heirs at law of John T. Garr, deceased, and decreed distribution of the estate to them. Thereupon the cross-petitioners prosecuted this appeal, and have assigned various errors.

It appears to be admitted that John T. Garr, deceased, was an unmarried man, a bachelor; that the cross-petitioners claim to be his grandchildren by reason of him having an illegitimate son, Johnnie Garr, the father of the cross-petitioners, by an Indian woman, name unknown, in the pioneer days in Cache county; that the said alleged son was a half-breed Indian; that the persons to whom the estate has been decreed by the trial court are the collateral kin of John T. Garr, deceased, in case Johnnie Garr, deceased, was not John T. Garr's son; that Johnnie Garr, the alleged illegitimate son, died intestate, in the year 1896, prior to the death of his alleged father, and left surviving him his widow, the guardian, and four minor children, the cross-petitioners.

The first question presented for determination is whether the evidence, taken all together, establishes the fact that Johnnie Garr was the illegitimate son of John T. Garr. The court found and held that the paternity of Johnnie Garr was not established, and counsel for the respondents insist that there is some conflict in the evidence, and that, the trial court having heard and observed the witnesses upon the stand while

testifying, this court ought not to disturb its holding on this point. These reasons for the well-known rule invoked, however, even if the rule applies to probate proceedings, lose much of their efficacy where, as here, nearly a year and a half elapse from the time of observing and hearing the witnesses before the decision of the case. Where a case is held for such a length of time under advisement as in this instance, we apprehend that the advantages which flow or ought to flow from observing the manner and bearing of the witnesses while on the stand will, through the trial of other causes and transaction of other business, have become well-nigh vanished, and that that court, when it finally passes upon the matter, is in little, if any, better position to weigh the evidence than are we. But, however this may be, upon very careful examination and consideration of the evidence presented in this record, we are unable to sanction the finding and holding of the court upon this point.

It appears from the evidence that about August, 1855, and for some time thereafter, John T. Garr was in Cache Valley, working on what was known as the "Church farm," and was unmarried; that a band of Indians were located about half a mile from the ranch or farm, having among them a quite good-looking young Indian woman, about eighteen or twenty years old, who attracted considerable attention; that the white people and those Indians were on quite friendly terms, considerable intimacy existing between them; and that occasionally some of the Indians went to the ranch, and this young Indian woman, from August on through 1855 and early part of 1856, used to go there, at various times, when she and John T. Garr would be noticed in the presence of each other and their association regarded rather more intimate than was common among men and Indians at that time. At first John T. lived on the Church farm, but afterwards he, with three brothers, resided at Millville, near that farm, where they had bachelor's quarters. In 1856 or 1857 (the exact date does not appear from the evidence) this Indian woman was first seen with the Indian baby, afterwards called Johnnie Garr. The witness Dowdle, who was there during those years, and

knew the Indian woman, and had previously, on various oc-
casions, seen her in company with Garr, testified that, when
he first saw her with the papoose, the mother said the child
was John T. Garr's, and that he afterwards told him what she
said. His testimony on this point is as follows: "I told
him, when I met him, as I said before, that that woman laid
the child to him, and I questioned him upon that subject, and
asked her—she said, in fact— She said, when I asked her
whose it was she said, 'White man, Cache valley.' Says I,
'Who is white man?' Says she, 'Nampawammock.' I told
that to John T. Garr when I met him. Says he: 'That's all
right. If she wants to lay it to me, it's all right. She can
do so.'" Nampawammock was the name, in Indian dialect,
by which John T. Garr was known. John T. Garr took the
Indian boy, while yet an infant, to his home at Millville, and
cared for him, and then the same witness again saw the child,
and as to that occasion testified: "It was at Millville where
I saw the Indian boy, about 1858, or 1859. I don't know
the exact year; might possibly have been 1860, but not later,
and I don't think it was later than 1859. At that time the
boy was somewhere along three years old. John T. Garr had
him in charge, right with him, right by his side; prattling
around his knees at the time I talked to him about the boy;
said to me that he was his boy." The witness Hill testified
as to a conversation between him and John T. Garr as fol-
lows: "Says I, 'What about that Indian boy of yours?' Says
I, 'Did you marry that squaw?' 'Or,' says I, 'is that your
son?' 'Well,' says he, 'that's my business, but,' says he, 'that's
my boy,' or 'my son.' 'Well,' says I, 'did you trade blank-
ets?' Says he, 'That's my business, but' says he, 'he's my
son.'" Then the witness, on cross-examination, respecting
the above statements, testified: "This conversation with John
T. Garr must have been in 1863 or 1864. John T. Garr was
a reserved man; wouldn't talk over his family affairs. That
was characteristic of the man. It was curiosity with me that
prompted me to ask about the Indian boy. He said it in a
way I thought he meant it. He said, 'He's my son.' He said
first, 'He's my boy.' And the last time I put the question,

'Did you trade blankets with her or pay money?' and he says, 'He's my son.'" The witness Hammer testified: "Was acquainted with the Indian boy. I first saw him in 1860 or 1861, at the Garr house in Millville. William and Abe and Ben were there. I says to the boys, 'What have you got there?' Abe or Billy says: 'That's John's. He bought him from a squaw.' John was present at the time. I should judge him to have been from two to four years old." The witness Mrs. Campbell, who was at that time a young lady and was engaged to be married to John T. Garr, testified to a conversation she had with him, as follows: "As we were talking one afternoon I went from Frank Weaver's over there to grind some coffee, and the young one was there half naked, and he [meaning John T. Garr] was a bachelor, of course, and I says, 'Well, do you always calculate to be keeping this papoose?' He said 'duty compelled him to.' I asked him why so. He says, 'A father is always supposed to take care of his own children.' I says, 'Papoose or not?' He says, 'Papoose.' I says, 'Do you acknowledge to be the father of that Indian Boy?' And he says, 'I am.' I says, 'You think I'd ever marry a man that had a papoose?' and we quit. Q. On that account? A. Yes, sir. Q. And at that time you state that you was engaged to be married to him? A. Yes, sir." She also, on cross-examination, testified: "I refused to marry a man that was father to an Indian." And in answer to the question: "When was the last time you saw John T. Garr?" the witness said: "I couldn't tell you exactly; met him at my sister-in-law's and talked to him, and he says: 'You want to go up to the house and see my grandson,' and I says, 'Have you got one?' and he says, 'Yes.'"

The witness Johnson testified that "a short time prior to John T. Garr's death" he had a conversation with him where he was plowing potatoes, and then stated: "He plowed up two rows of potatoes, and then we sat down, or he did, on his plow beam, and there was a couple of those children, those two smallest, climbed up on him and put their arms around his neck and began kissing him and he kissed them. I says, 'If Johnnie was alive now,' referring to young Johnnie Garr, this

lady's husband, 'he'd be fond of all those pretty little children, wouldn't he?' He says, 'I should think we would.' He says, 'Their grandpa is proud of them.' And at that there was another one, I think this girl, came running up, and she says, 'I love grandpa too,' and he put his arms around her neck and he kissed her. That's about all the conversation we had in regard to the family. He says, 'I'm proud of my grandchildren.'" The witness Sarah H. Weaver said: "I had a conversation with John T. Garr. He came to my house Sunday morning very early, and he says: 'Aunt Sarah, I've come to tell you the news. I'm a grandfather this morning.' I says, 'Is that possible?' He says, 'Yes, they've got a baby up at Johnny's,' and I says, 'Well, that is news. Is it a boy or a girl?' He says, 'A boy.' 'Well,' I says, 'I suppose, then, if it is a thousand dollar boy it's all right.' He says, 'It's all right.' He stayed and ate breakfast. He seemed to come because he was pleased and to tell me as an old friend. He came four blocks to tell me this. And after Johnny died those twins were born. He came up and told me that occurrence. He says, 'We've got the nicest pair of twins there, my grandchildren, and I want you to come and see them.' That's Deloris and Johnny D., the two children." The witness King testified: "At the time John T. Garr received information of Johnny's death, he came right up to my place and said, 'John, I've got sad news this morning.' I says, 'What's the matter, John?' He says, 'My boy is dead.' Says I, 'Your boy is dead? Who?' He says, 'Jack Johnny.' Says I, 'Is that possible?' He says, 'Yes; what had better be done under the circumstances?'" The widow of Johnnie Garr testified: "My husband met his death in Blacksmith Fork canyon. He died seven years ago. Prior to his death I had three children, two living and one dead. Seven months after his death I had twins, John D. and Deloris. I now have the four children whose names are as stated. My husband did not leave any will. John T. Garr was there [at the house] the biggest part of the time. He watched the children grow; watched them around the house. Every move they made he'd watch them, and when he thought there was a cute little act in them he'd

say, 'Come to grandpa.' He slept in the east room. He ate principally, at Eliza A. Garr's. He ate his dinner with us a part of the time. John [meaning John T. Garr] gave the second girl her name, and asked me to name the boy John-nie. He taught the children to call him 'grandpa.' John T. Garr plowed the lot. I planted the most of it to vegetables. The vegetables were used in the family.

There is much of this character of testimony in the record, showing that John T. Garr was on intimate terms with the Indian girl before the child was born, and that he, after the child was born, admitted that it was his, and, it seems, never denied its paternity, but took the little boy, while yet an infant, into his home, although he was unmarried, fondled him, cared for him, and raised him as was natural for a father to do. As appears from the evidence, he showed, as the years went by in his humble home, that affection for the boy that points unerringly to a father; and, after the boy became a man, was married, and had children, he assumed the role of grandfather, continued to live with him and to call him his son, extended his affections to the son's children, calling them his grandchildren, and to the family until his son's death, and thereafter continued the same relations with the deceased's family, exhibiting an affection for and interest in them only natural to a devoted grandfather, until the very time he himself answered the final summons. · This shows a course of conduct and acts wholly unnatural for a mere stranger, and is convincing to the mind that to the bond of love that binds the father to the child must be attributed that conduct and those acts. Against the evidence which shows this state of affairs the respondents introduced testimony to the effect that John T. Garr, or one of his brothers for him, bought the papoose from its mother for a pair of blankets and other trinkets; but, if it were admitted or satisfactorily shown that he traded blankets and trinkets for the child, it would not militate very forcibly against the position that he was the father of the child, for, to those who are at all familiar with Indian ways and customs, it would not be surprising that the Indian mother would want some-

thing in return for her papoose, even from its father. To
them the surprise would doubtless be infinitely greater to
learn that a mere stranger, a bachelor, had taken such a baby
from its mother and through all the years bestowed upon it
the affections of a father. One witness also stated that he
heard John T. Garr say, and several that they heard his
brothers say, that the father of the boy was a man by the name
of Jones; but that testimony, in view of the life of John T.
Garr and his conduct toward and treatment of the boy, is, to
say the least, not very convincing against parental relations,
especially when considered with the testimony showing his
numerous admissions and acknowledgments of the paternity
of the boy. It may well be that, considering his innate re-
gard for those who were bound to him by the ties of consan-
guinity, their high station in the community as indicated by
the evidence, their religious sentiments, their natural abhor-
rence of the immoral and degrading act committed, probably
in an unguarded moment, he was loth to admit to them his
true relation to that child, and, to ward off suspicion of his
kin, mentioned some one else as its father. Several witnesses
also gave testimony of a negative character to the effect that
they never heard John T. Garr call the child his son, or his
boy, and never heard any of his kin refer to him as the father
of the boy; but when we consider that, as appears from the
evidence, John T. Garr was a seclusive character, reticent
about his business affairs, not communicative as to matters
affecting himself, such testimony is entitled to but little, if
any, weight. Upon close scrutiny of, and in answer to, the
testimony relied upon by the respondents to uphold the action
of the court, it may fairly be said that such evidence tends but
to show that John T. Garr, having fallen into the commission
of a disreputable offense with an unfortunate girl of inferior
race, he, a member of a family mingling in social intercourse
and possessed of commanding influence in the community,
was desirous of concealing the disgrace which his kin would
naturally feel if he disclosed to them the real facts by deliber-
ate acknowledgment. Hence, if that evidence is all true, it
cannot overbalance the weight of his deliberate admissions to

those not of kin, and of his acts and conduct toward the boy and his family. The conclusion upon all the evidence in the case is irresistible that he was in fact the father of the child, and that the finding and holding of the court to the contrary was so manifestly erroneous and against the interests of justice that this court cannot uphold it.

The next question is whether the children of Johnnie Garr, who was the illegitimate son of John T. Garr, deceased, can, under our statutes, inherit the decedent's estate; or, in other words, was Johnnie Garr legitimated, under the statutes, so that he transmitted inheritable blood to his children? The respondents insist that, even if Johnnie Garr was John T. Garr's illegitimate son, still, as a matter of law, Johnnie Garr, having died in 1896, four years prior to the death of John T. Garr, his children cannot, as heirs of their father, inherit any portion of John T. Garr's estate. This would undoubtedly be true at common law, and were this question to be decided under the common law, as it prevailed in England, the heirs of Johnnie Garr, notwithstanding the question of his paternity has hereinbefore been decided in their favor, would be doomed to defeat. The rigors of the English common law denied all rights as an heir to the illegitimate, and imposed many disabilities. He was regarded as the child of no one, *filius nullius* or *fillius populi,* not even entitled to a name, unless he gained one by reputation; could, as an heir, inherit neither through his father nor his mother. *Filius nullius,* he had no inheritable blood. Except those of his own body, he had no heirs. The duty his parents owed him was principally that of maintenance, and this was because of the ties of nature, although not a child to any civil purpose. If he succeeded to gain a name by reputation, he could purchase property, but only to him and the heirs of his own body. His incapacities extended even to the church, for he was incapable of holy orders, and could hold no dignity in the church, although this doctrine, it seems, is now obsolete. (1 Bl. Comm. 459.) In the event of his death intestate, without descendants, his estate, no matter how acquired escheated to the crown. (*In re Wilcox Statement,* 1 L. R. Chan. Div. 229.)

And under this doctrine subsequent marriage of the parents even did not legitimate the bastard, although he might be made legitimate by an act of Parliament. The civil and canon laws were less severe in these respects, for under those laws the subsequent-marriage of the parents worked legitimation, and under the Roman law bastards could inherit from their mothers. But the dictates of humanity and justice, against visiting the crimes and iniquities of parents upon their innocent children, have materially lessened the incapacities of these unfortunates, in this country, by inducing legislative modifications of the common law. Although the laws of the different States of our American Union differ widely as to the capacities, incapacities, and rights of illegitimate children, most, if not all, of the states have, either by legislative enactment or judicial decision, more or less mitigated the vigorous doctrine of the common law. The tendency has been and is toward liberality and the conferring of rights denied by that law. In most of the states the father and mother, like under the Roman law, may, at their option, legitimate their children, born out of lawful wedlock, by marriage *ex post facto*. Such children now inherit from the mother and the mother from them in nearly all, if not all, of the states; and in some of them, when there is an acknowledgment by the father, either in writing or otherwise as required by statute, or a general, open, and mutual recognition, the illegitimate children inherit from the father, from each other, and from collateral kin. Such, in general, being the doctrine in the several states, the question is as to what extent the rights of one born out of lawful wedlock and his offspring are recognized by statute in this state, for the common law cannot be an authority in opposition to our positive enactments.

In considering this question, we recognize the rule, invoked by the respondents, that the statute in force at the time of the death of the intestate must determine who are the heirs and their rights to the inheritance; but we are also mindful of the fact that in this state, contrary to the general rule that statutes in derogation of the common law must be strictly construed, such statutes "are to be liberally construed with a view to ef-

fect the objects of the statutes and to promote justice." Section 2489, Rev. St. 1898, and the law is equally well settled that, in order to ascertain the legislative intent which controlled a given enactment, and the policy of the state as to the subject, the court may examine anterior legislation upon the same subject. In the light of these principles the interpretation must be made so as to effectuate the purpose designed by the Legislature and policy of the state. The provisions of the statute in force at the time of the death of John T. Garr, and which must determine the heirs and their rights, are found in sections 10 and 2833, Rev. St. 1898. In section 10 it is provided that:

"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth."

Section 2833, so far as material here, provides:

"Every illegitimate child is an heir of the person who acknowledges himself to be the father of such child; and in all cases is an heir of his mother; and inherits his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock."

Looking at section 10, it will be noticed that where a father publicly acknowledges an illegitimate child, receives it into his family, with the consent of his wife, if he has one, and treats it as if it were a legitimate child, he thereby adopts it and legitimates it, from the time of its birth, for all purposes. The essentials to a legitimation are public acknowledgment by the father, receiving of the child into his family, and treatment of it as a legitimate child. Doubtless where the father, who has no wife, receives the child into his family, the effect is the same as if he had one and her consent. Under section 2833, such a child is in all cases an heir of the mother, and also an heir of the person who acknowledges himself to be its father, and in such event the child is entitled to inherit, not only from the mother, but also from the father, in the same manner as if born in lawful wedlock. The provisions are

broad and comprehensive, and a full compliance with them would clearly seem to remove all the disabilities existing at common law as to the right of such a child to inherit, and as to such right place it upon the same basis as a legitimate child.

In argument in this case it is not denied, and, indeed, cannot be, under the facts disclosed in evidence, that John T. Garr received Johnnie Garr into his family and treated him as his child, or, at least, as a father naturally would treat his child; but the respondents insist that there was no acknowledgment by John T. Garr that he was Johnnie's father. We have, however, already herein decided that there was an acknowledgment by the father, and that the paternity of Johnnie Garr was established; but we are now confronted with the further contention that, even if the paternity was acknowledged, still that, as Johnnie died before his father, his children cannot inherit from the father, under the provisions of statute above quoted and laws of this state. It is insisted that there is nothing in the statute indicating an intention on the part of the Legislature to confer any benefit upon grandchildren in such a case. In other words, it is urged that under our laws the rights of an illegitimate and of his descendants, whatever they may be, are strictly lineal, never collateral, and that therefore the appellants have no valid claim on the estate of John T. Garr as heirs at law. To discover the true object of this particular enactment and the general policy of the state it becomes important to examine and consider other statutes made previously upon this subject. For such purpose all such legislation should be examined and construed together. The general doctrine and policy of the state, expressed in anterior legislation, may constitute potent factors in determining the intent of the last expression of legislative will.

"To discover the true meaning of a statute," says Mr. Chief Justice Parsons, "it is the duty of the court to consider other statutes made *in pari materia*, whether they are repealed or unrepealed." (*Church v. Crocker*, 3 Mass. 17.)

The legislation upon this subject, in this jurisdiction, dates back to 1852, when the territorial Legislature made an enact-

ment, which was approved March 3, 1852, and of which section 25 reads as follows:

"Illegitimate children and their mothers inherit in like manner from the father, whether acknowledged by him or not, provided it shall be made to appear to the satisfaction of the court, that he was the father of such illegitimate child or children." (Laws 1850-55, p. 153.)

This statute continued in force until 1876, when the Legislature enacted:

"Every illegitimate child is, in all cases, an heir to its mother. It is also heir to its father when acknowledged by him." (Section 714 Comp. Laws Utah 1876.)

The next enactment on this subject was made in 1884 as follows:

"Every illegitimate child is an heir to the person who acknowledges himself to be the father of such child; and in all cases is an heir of his mother; and inherits his or her estate, in whole or in part as the case may be, in the same manner as if he had been born in lawful wedlock." (Laws Utah 1884, p. 75, section 4.)

This section is the same, *verbatim et literatum,* as, section 2833, Rev. St. 1898, hereinbefore quoted. There is no question that section 4 remained in force until 1887, when the Edmunds-Tucker law was enacted by Congress. Section 11 of that law (Act March 3, 1887, c. 397, 24 Stat. 637) reads:

"That the laws enacted by the Legislative Assembly of the territory of Utah which provide for or recognize the capacity of illegitimate children to inherit or to be entitled to any distributive share in the estate of the father of any such illegitimate child are hereby disapproved and annulled; and no illegitimate child shall hereafter be entitled to inherit from his or her father or to receive any distributive share in the estate of his or her father: Provided, that this section shall not apply to any illegitimate child born within twelve months after the passage of this act, nor to any child made legitimate by the seventh section of the act entitled 'An act to amend section fifty-three hundred and fifty-two of the Revised Statutes of the United States, in reference to bigamy, and for other purposes,' approved March twenty-second, eighteen hundred and eighty-two."

It will be noticed that, in enacting this section, the Congress of the United States must have recognized the fact that,

as the laws of the territory stood up to that time, illegitimate children had the right to inherit from their fathers, else that body of legislators would not have been moved to annul those laws. That congressional enactment, then, serves as an interpretation by the highest legislative body in this country of the laws of the territory in force in 1887, including the identical provisions of statutes which were afterward re-enacted in section 2833, Rev. St. 1898, and which section was in force at the time of the death of the intestate. That interpretation clearly indicates that at that time illegitimates had the right to inherit from the father the same as if "born in lawful wedlock" (the language of the statute) ; that is, the same as if born legitimate. Such interpretation is entitled to great weight in determining the question of legislative intent in the present case. The Supreme Court of the United States, in *Cope v. Cope,* 137 U. S. 682, 11 Sup. Ct. 222, 34 L. Ed. 832, indicated a similar interpretation as to section 25, above quoted, of the territorial act of 1852. There George H. Cope was admitted to be the illegitimate child of Thomas Cope by a polygamous wife, and George claimed the right to inherit a share of his father's estate by virtue of section 25 of the territorial law. The contention against him was that, even conceding the validity of the territorial statute, it was abrogated by the anti-polygamy act of Congress of 1862, which disapproved and annulled certain territorial acts, countenancing, aiding, and abetting polygamy. The court, holding that the territorial statute was not annulled by that act, in the course of its opinion and speaking through Mr. Justice Brown, said:

"It [section 25] does not declare the children of polygamous marriages to be legitimate; in fact, it treats them as illegitimate, or rather it does not except by indirection or inference mention them at all, but it puts all illegitimate children, whether the fruits of polygamous or of ordinary adulterous or illicit intercourse, upon an equality and vests them with inheritable blood. . . . As this act annuls only such territorial laws as shield or countenance polygamy, if we sustain the construction urged by the respondents here, it must necessarily follow that the children of polygamous marriages would be deprived of their power to inherit from the father, while the offspring of other illicit relations would be left to inherit under that act. This would seem to be at war with the intent of the Legislature."

Then, after referring to the Edmunds law of 1882, providing for further punishment of polygamy, the court, with reference to the act of 1887, said:

"Here, then, is the first clear and unqualified declaration of Congress of its disapproval of the legislation of Utah recognizing the inheritable capacity of the issue of polygamous marriages; and so careful is Congress of the rights acquired or existing under these laws that it excepts by special proviso all children declared to be legitimate by the seventh section of the act of March 22, 1882 (22 Stat. 31 [U. S. Comp. St. 1901, p. 3635]), as well as all illegitimate children born within twelve months after the passage of this act. These several acts of Congress, dealing as they do with the same subject-matter should be construed not only as expressing the intention of Congress at the dates the several acts were passed, but the latter acts should also be regarded as legislative interpretations of the prior ones. (*United States v. Freeman,* 3 How. [U. S.] 556, 564, 11 L. Ed. 724; *Stockdale v. Insurance* Co., 20 Wall. [U. S.] 323, 22 L. Ed. 348.) Now if it had been intended by the act of 1862 to annul the territorial act of 1852, fixing the inheritable capacity of illegitimate children, why did Congress in 1882, recognize the legitimacy of children born of polygamous or Mormon marriages prior to January 1, 1883? Or why, in the act of 1887, did it save the rights of such children, as well as of all others born within twelve months after the passage of that act? The object of these enactments is entirely clear. Not only does Congress refrain from adding to the odium which popular opinion visits upon this innocent, but unfortunate, class of children, but it makes them the special object of its solicitude, and at the same time offers to the parents an inducement, in the nature of a locus penitentiae, to discontinue their unlawful cohabitation."

Under such interpretations made and indicated by the highest legislative and judicial authorities in our country, can there be any doubt as to the inheritable rights of illegitimate children, under the laws as they existed up to 1887? Is there any doubt that the Legislature, when, in view of that interpretation, it re-enacted the statute of 1884, after the territory had been admitted into the Union as a state, intended that those rights should continue to exist? We think not. Evidently the intention was that illegitimate children should have vested in them inheritable blood and the right to inherit from the father, when acknowledged by him, in the same manner and to the same extent as if they had been born legitimate. This is also clear from the context of the statute, especially when interpreted in the light of the doctrine of the law hither-

to prevailing within this jurisdiction. Such being the case, the right, when once vested in the illegitimate, extends to his descendants, and they likewise become heirs in the event of the death of their father. The interpretation thus placed upon the statute in this case is in consonance with the presumption, which is that, when the design or object of an enactment is not manifestly apparent, the Legislature intended the most beneficial construction to be placed upon it. The views herein expressed are not without authority. (3 Am. & Eng. Ency. Law [2d Ed.], 879; *Brewer v. Hamor*, 83 Me. 251, 22 Atl. 161; *Dickinson's Appeal*, 42 Conn. 491, 19 Am. Rep. 553; *Sutton v. Sutton*, 87 Ky. 216, 8 S. W. 337, 12 Am. St. Rep. 476; *Gaines v. New Orleans*, 6 Wall. [U. S.] 642, 18 L. Ed. 950.)

Upon the foregoing considerations, the conclusion is inevitable that the appellants are heirs of John T. Garr and entitled to inherit his estate. It is not deemed necessary to decide any of the remaining questions presented.

The judgment must be reversed, with costs, and the cause remanded, with instructions to the court below to set aside its decree and proceed in accordance herewith. It is so ordered.

McCARTY and STRAUP, JJ., concur.