548

## In re ROBERTS' ESTATE
## ROBERTS v. TRACY LOAN & TRUST CO.

Decided April 27, 1927.   Rehearing Denied June 16, 1927.
(256 P. 1068.)

*L. A. Miner*, of Salt Lake City, for respondent.

*S. P. Armstrong*, of Salt Lake City, for appellant.

THURMAN, C. J.

F. J. Roberts, a resident of Salt Lake City, died intestate on September 23, 1925, leaving personal property therein of the value of $4,000. The petition for letters of administration alleges that deceased left as his only heirs at law, a son, F. L. Roberts, 38 years of age, residing in Omaha, Neb., and two grandchildren, to wit, Stanley Roberts Roth, aged 12 years, and Russel Anthony Roth, aged 8 years, both of whom reside in Salt Lake City. The petition was filed by the said F. L. Roberts requesting the appointment of Harvey H. Cluff, as administrator of the estate of said deceased. It appears from the petition that the said F. L. Roberts was entitled to letters of administration except that he was not a resident of this state, and for that reason he requested the appointment of said Harvey H. Cluff, a resident of Salt Lake City, Utah.

A cross-petition was filed by the Tracy Loan & Trust Company, a corporation, of Salt Lake City, as guardian of one Louise Stark, a minor, of the age of 16 years, residing in Salt Lake City. The cross-petition, in substance, alleges on information and belief that the said Louise Stark is an illegitimate daughter of said deceased, and that he duly acknowledged himself to be her father; that she is therefore an heir of said deceased and entitled to share in the distribution of his estate. Cross-petitioner prays for letters of administration. Jurisdictional matters alleged in the cross-petition were substantially the same as alleged in the petition.

The trial court found the issues against the cross-petitioner and directed that letters of administration be issued to Harvey H. Cluff, as prayed for in the petition. It also found

that Louise Stark was not an illegitimate child of deceased, and that he had not acknowledged that she was his child. From the judgment entered in accordance with the findings, the cross-petitioner appeals.

If the findings last referred to are sustained by the evidence, it will not be necessary to determine whether or not the court erred in directing letters of administration to Harvey H. Cluff, as prayed for in the petition.

The principal error assigned is that the evidence is insufficient to support the findings to which we have referred.

Many witnesses were sworn on behalf of the cross-petitioner. It is unnecessary to review in detail the testimony of each witness. There is little or no conflict in the evidence. The evidence shows that the deceased, Frank J. Roberts, came to Salt Lake City in 1917. He had formerly lived in the state of Nebraska. He was divoced from his wife shortly before coming to Salt Lake. He was watchman for the Purity Biscuit Company of Salt Lake City for several years prior to his death, which occurred in an elevator accident in September, 1925. At the time of his death his known and undisputed heirs were his son in Nebraska and two grandchildren in Salt Lake City, all of whom are named in the petition. There is evidence in the record to show that the deceased worked at the city waterworks of Lincoln, Nebraska, from 1908 to 1911, inclusive, and that he never left there until 1911, when he made a trip to California.

Before stating the facts relied on as tending to prove that deceased acknowledged himself to be the father of Louise Stark, we will briefly state some undisputed facts concerning her life. She was born in Salt Lake City, May 5, 1910. Her mother's maiden name was May Marie Perine. The latter was born in France and came to America during early childhood. She married Mr. Fred Stark in July, 1910, three months after Louise was born. Mr. Stark testified at the trial that he was not the father of Louise; that he had known

her mother about a year before he married her and had kept company with her very little until shortly before their marriage. Louise was taken by Stark into his family and was treated as his daughter. She assumed the family name. Stark resided in Salt Lake City at different places from the time deceased came in 1917. Stark's testimony that he had known Louise's mother for about a year before he married her is practically all that the record discloses concerning her prior to their marriage. Shortly after deceased came to Salt Lake City, in 1917, he called frequently at the Stark home on his way to and from his work. Mrs. Stark did washing and mending for him, and he paid her for such service. Mr. Stark was cognizant of these facts and interposed no objection. There is much testimony to justify the conclusion that deceased formed a strong attachment for Louise, who was only 7 years of age when he came to Salt Lake City. Usually, when he called at the Stark home, he would ask "Where is my girl?" or "Where is Louise?" He would bring her crackers or cookies from the factory; sometimes gave her a little money to buy candy; would sometimes take her to shows or to the fair. This conduct of deceased towards Louise continued more or less the same down to the date of his death, when Louise was 15 years of age. Mrs. Stark, Louise's mother, died in 1921. During the 3 or 4 years that she lived after deceased came to Salt Lake City, he treated her very kindly. As before stated, she did washing and mending for him, and, in addition to paying her for such services, he sometimes gave her money to buy things for Louise. During her last illness deceased frequently called at her home and did little acts of kindness for her, such as making beef tea, coffee, etc., for her nourishment. He told one witness that he thought she was a very good woman and that he thought a great deal of her. The same witness also testified as to his treatment of Louise; that on one occasion deceased called for Louise, and upon being informed that she was working at a restaurant he appeared displeased; that he said he did not want her to work at restaurants, he

wanted her to go to school; that he said, "Louise is 16 years of age, when she is 18 she can choose." The same witness also said she saw deceased "put his arm around Louise's shoulders and tell her he would like to take her out more, but her father wasn't willing for her to go out much."

Louise testified to many acts of kindness of the nature above described. She supposed it was because he was her mother's friend. She never knew but that Mr. Stark was her father. When her mother was on her deathbed, and about two weeks before she died, she told Louise she "wanted her to always respect and honor Mr. Roberts as a father."

After deceased's death, and his son had taken many things away, his landlady found two photographs in his room—one of deceased and the other of Louise. A photographer who was acquainted with deceased testified that on one occasion deceased said to him, "If my girl, Louise, comes up here, take her picture, and I will pay for it." The photographer afterwards took her picture. He testified there was a strong resemblance between the picture of deceased and that of Louise. One or two other witnesses testified to the same effect.

The most direct testimony relating to the question of acknowledgment was that of the witness Mickelson, who testified that on one occasion he was at the biscuit factory and deceased asked "Where is my girl?" Witness did not know whether he was joking or not, and asked, "Is she your daughter?" Deceased said, "Yes; didn't you know that?" and smiled. Witness said deceased never told him that before; that it sounded like he might be joking, but when witness asked him if she was his daughter, and he took it serious, witness thought she was his daughter. Witness further said deceased "was kind of jolly, he always joked about different things, and sometimes he would say things funny like that."

After Louise's mother died in 1921, Mr. Stark married another woman and Louise continued as a member of the

family. On one occasion when deceased was at the Stark home, Louise was playing with a cat. Her stepmother, Mrs. Stark, told her she was too big for that. Deceased said, "Don't get after her for that; her mother used to play with cats before she was born."

Finally, it appears that Mrs. Stark told deceased not to come there any more. Deceased said he could see Louise at some other place. Deceased frequently took Louise and her mother to restaurants for dinner, and after her mother died he took Louise and the stepmother to dinner and other places. Sometimes he would take Louise alone.

Such are the main features of the evidence relating to deceased's conduct towards Louise, which constitutes the foundation of appellant's contention that she was a daughter of deceased and acknowledged by him to be such.

Appellant relies upon Comp. Laws Utah, 1917, § 6413, which, in part, reads as follows:

"Every illegitimate child is an heir of the person who acknowledges himself to be the father of such child."

The burden was upon appellant to prove the allegations of the cross-petition that Louise Stark is an illegitimate child of deceased, and that he acknowledged her to be his child. I am of opinion appellant has not sustained the burden.

The evidence is conclusive that Louise is an illegitimate child. Whether the deceased, Frank J. Roberts, was her father and acknowledged himself to be such is the question to be decided.

There is no conflict whatever in the evidence. We are clearly of opinion that the finding of the court that the deceased was not the father of Louise was abundantly sustained by the evidence. It does not appear that deceased ever saw May Marie Perine, the mother of Louise, until he came to Salt Lake City in 1917. Louise was then 7 years of

age. It is true that Louise in her testimony stated that her mother "traveled all over." This she undoubtedly learned from her mother, but the only places she could designate was Washington state and Portland. Her mother evidently had never mentioned to Louise the state of Nebraska as one of the places where she had been. It appears from the evidence that from 1908 to 1911 deceased was working in the city waterworks at Lincoln, Nebraska, and that he never left there until some time in 1911 when he went to California. There is not a scintilla of evidence that the mother of Louise was ever in the state of Nebraska during the period from 1908 to 1911. Louise was born May 5, 1910. So that it must be conceded, as far as appears from the evidence here, that deceased was not the natural father of Louise.

Appellant contends that proof of natural parentage is not an essential factor in this class of cases.

While it may not be necessary to determine that question in order to decide the case at bar, yet it was made an issue in the pleadings and evidence admitted thereon. I cannot avoid the conclusion that the plain meaning and ∎ intent of the statute is that both natural parentage and unambiguous acknowledgment of the relation of father and child must exist in order to establish heirship in a case of this kind. If such were not the rule, it is easy to conceive of great abuse and even injurious consequences in many cases that might arise. It is conceivable that a kindly disposed man might introduce a boy as his son or refer to him as "my boy" or "my son," or address him as such, when, in fact, no such relation exists. He might engage in similar conduct towards a young girl to whom he was in no manner related. Furthermore, if he was of a generous nature and took a fancy to a child, he might bestow upon it so many favors that it would become more or less conspicuous among those familiar with such conduct. Can it be assumed in such cases, without satisfactory proof of natural parentage, that the relation of father and child actually exists? And if it be conceded that proof of such conduct will not justify

such assumption, then can it be consistently contended that the heirship of such child has been satisfactorily established? These, it seems to me, are matters for serious consideration and are controlling questions in the instant case. It is unbelievable that the legislature that enacted the law in question contemplated that in cases of the kind we have mentioned the inheritance of lawful heirs should be divested even in part and transferred to a stranger. Such, however, would probably be the consequences if the rule for which appellant contends should be adopted. We are therefore of opinion that, in order to establish heirship under the statute, there must be satisfactory proof not only of acknowledgment of the relation of father and child, but satisfactory proof of the relation itself. Without such evidence we are of opinion a case of heirship under the statute is not established. Even if acknowledgment alone were sufficient to establish heirship, we would feel it our duty to hold that such acknowledgment should be indubitable and unambiguous.

It cannot be consistently contended in view of the evidence here that proof of acknowledgment is clear and free from doubt. True, in answer to a question of the witness Mickelson, deceased on one occasion, in effect, admitted that Louise was his daughter, "and smiled." Mickelson further testified that deceased was in the habit of "saying funny things like that." True, also, deceased expressed solicitude to another witness because Louise was working at a restaurant and said he wanted her to go to school. But he also said to the same witness that he would take Louise out more "but her *father* didn't want her to go out much." (Italics ours.) Conduct fraught with such ambiguities and uncertainties as this does not measure up to the standard that should be applied in testing the genuineness of the acknowledgment. The deceased's apparent attachment for Louise was unusual, but we cannot assume that it was extraordinary. Deceased was separated from his family and lived alone. He had constant employment and had acquired some means. He had

no one dependent upon him for support. He became acquainted with Louise's mother and hired her to do his washing and mending. In that way he became acquainted with Louise when she was a mere child. He took a fancy to her and did her many acts of kindness. He frequently referred to her as "my girl," and manifested solicitude for her welfare. Even if proof of parentage were not required, as contended by appellant, we are clearly of opinion that the evidence offered to prove acknowledgment was not sufficient to establish the fact.

Appellant has cited many cases upon the points we have discussed. But they are not applicable for the reason that they are controlled by statutes different from our own. Besides this, the cases referred to, so far as they are applicable to the instant case, rather tend to sustain the contention of respondent. Without further comment as to these cases, we cite them here for the benefit of the reader who may be interested in the subject: *Van Horn* v. *Van Horn,* 107 Iowa, 247, 77 N. W. 846, 45 L. R. A. 93, 94; *Breidenstein v. Bertram,* 198 Mo. 328, 95 S. W. 828; *In re Garr's Estate,* 31 Utah, 57, 86 P. 757; *Houghton* v. *Dickinson,* 196 Mass. 389, 82 N. E. 481; *Alston* v. *Alston,* 114 Iowa, 29, 86 N. W. 55; *Gilmanton* v. *Ham,* 38 N. H. 108; *Warlick* v. *White,* 76 N. C. 175. Also, 3 R. C. L. 964, note 1; *Wigmore, Evidence,* §§ 166 and 1164.

Other cases are cited, but the above illustrate appellant's contention. Some of the cases bear upon the question of opinion evidence excluded by the court over appellant's objection. There was no error in excluding the evidence, and we find no error in the record.

The judgment is affirmed at appellant's cost.

CHERRY, STRAUP, HANSEN, and GIDEON, JJ., concur.