672 A.2d 608

**Linda C. MOLESWORTH**

v.

**Randall BRANDON et al.**

**No. 83, Sept. Term, 1995.**

Court of Appeals of Maryland.

March 5, 1996.

Alan Hilliard Legum (Alan Hilliard Legum, P.A., on brief), Annapolis, for petitioner.

E. Alexander Adams (Betty Smith Adams, Adams & Adams, on brief), Ellicott City, for respondent.

Glendora C. Hughes, General Counsel; Jonathan P. Sills, Assistant General Counsel, State of Maryland Commission on Human Relations, Baltimore, for amicus curiae.

Jay R. Fries, Joan E. Book, Kruchko & Fries, Baltimore, for amici curiae The Maryland Chamber of Commerce and The National Federation of Independent Business.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL, and RAKER, JJ.

MURPHY, Chief Judge.

The issues in this case are first, whether a common law cause of action for wrongful discharge of a female employee based on sex discrimination lies against an employer with less than fifteen employees and second, whether, in such a case, the court must instruct the jury that where the same person hires and fires the employee, there is an inference that the discharge was not due to the employee's sex.

I

Dr. Linda Molesworth, D.V.M., graduated from the University of Pennsylvania Veterinary School, received her license to practice veterinary medicine in the state of Maryland, and, on July 1, 1988, began working for Dr. Randall Brandon, D.V.M., whose practice concentrated on thoroughbred racehorses. The other members of the practice at that time were Dr. Jeffrey Palmer, who had been with the practice for several years, and Dr. Mark Akin, who had started just a few months earlier. Molesworth was the first female full-time veterinarian employed by Brandon.

When she began, Molesworth was informed that, as the least experienced person in the practice, her primary duty would be working in the Lasix barn at the Laurel racetrack, giving Lasix shots to horses,[1] approving medications, and performing other miscellaneous tasks. On several occasions, Brandon told Molesworth that someone had complimented her work. Molesworth received bonuses in December, 1988 and

---

1. Lasix is administered to some horses prior to racing in order to prevent hemorrhaging in the lungs.

March, 1989. On July 1, 1989, her contract was renewed and her salary increased from $25,000 to $30,000.

Dennis Manning, a trainer at the racetrack, was not pleased with Molesworth, however, because he did not want a female veterinarian in the barn. Nevertheless, in August of 1989, Molesworth received another bonus along with a note from Brandon which read:

Linda, you are doing a very good job and I appreciate your efforts. Don't worry about the Mannings. We can't please them all. He's the one with the problem. Thanks, Randy.

Again, in December, 1989, Molesworth received a bonus with a note from Brandon which read: "You are doing very well in the practice and the clients are quite happy with you."

Akin decided to leave the practice as of April 1, 1990. A trainer who was not employed by Brandon gave Akin a going-away party to which Molesworth was not invited. When Molesworth discovered this, she asked Brandon, at a meeting in April, 1990, why she had not been invited. He laughed and said she would have been the only woman there. At the same meeting, Brandon informed Molesworth that some of the trainers at the racetrack were complaining about her. Brandon said her work was fine and that the trainers had "never had a female veterinarian work for them before." He told her that she was doing fine and to "give them some time."

A new associate, Dr. Greg Fox began working for Brandon in May, 1990. Molesworth and Fox performed about the same amount of Lasix work. Molesworth complained to Brandon that Fox, as the most junior member of the practice, should be primarily responsible for the Lasix work. Brandon responded that he wanted Fox to meet the clients.

During May and June of 1990, Molesworth was not informed of any other complaints from trainers and on July 1, 1990, her salary was increased from $30,000 to $35,000. On July 13, 1990, Molesworth met with Brandon and Palmer, who had a contract to acquire 48% of the stock in the incorporated practice. Brandon informed Molesworth that her contract would not be renewed because of complaints from approxi-

mately eight trainers. Molesworth asked if she was being fired because she had complained about the Lasix schedule. Brandon replied that was not the reason. She then asked if she was being fired because she is a woman. Palmer replied, "Yes, that's part of it." According to Molesworth's testimony, Brandon "nodded in agreement and looked away" without verbally responding. Brandon told Molesworth that he would give her an excellent recommendation and that her veterinary work was fine.

On September 20, 1991, Molesworth filed a complaint against Brandon in the Circuit Court for Anne Arundel County alleging common law wrongful discharge. The complaint alleged that when she was terminated by Brandon, "she was informed by [him] that her employment was being terminated by him because of the fact that she was female." She claimed $150,000 in compensatory damages and $150,000 in punitive damages. The court denied Brandon's Motion for Summary Judgment.

At trial, Molesworth testified about the July 13, 1990 meeting with Brandon and Palmer. Palmer denied having made the statement attributed to him, and Brandon denied having nodded in agreement. Both doctors testified that when Molesworth asked if she was being fired because she was a woman, they answered "no."

Nancy Heil, a trainer, testified that she had no problem with Molesworth. Several other trainers testified for Brandon that Molesworth was argumentative and inflexible. Akin testified that when Molesworth gave shots, she frequently left "knots" which upset the trainers. In addition, Dr. Jean Dobson testified that Brandon offered her a job in the fall of 1990, after Molesworth was fired and before she filed suit. Dobson said she turned down the offer because she earned significantly more money at the Food and Drug Administration.

At the end of the testimony, the court denied Brandon's Motion for Judgment. Therefore, he requested that the jury be instructed, in part, as follows:

In cases where the hirer and firer are the same person, there is a strong inference that the discharge from employment was not due to sex discrimination, because it does not make sense that someone would hire a member of a class he does not like, only to discharge that person once he or she is on the job.

The court refused to instruct the jury as requested.

Molesworth claimed damages of $28,496.41 for lost wages from 1990, 1991, and 1992. She presented no evidence of monetary damages for 1993. The jury interrupted its deliberations to inform Judge Chester Goudy that it had found in favor of Molesworth but without any non-economic damages. It inquired whether it could award attorney's fees, and Judge Goudy instructed the jury that it could not. On September 13, 1993, the jury awarded Molesworth $39,198 in damages. Brandon's Motion for Judgement Notwithstanding the Verdict, Motion for New Trial, and Motion to Revise the Judgment were denied.

Brandon appealed to the Court of Special Appeals; that court held that the common law wrongful discharge cause of action was available to Molesworth and that she presented sufficient evidence to withstand Brandon's Motions for Summary Judgment, Judgment, and Judgment Notwithstanding the Verdict. The court, nonetheless, reversed the circuit court's judgment, basing its ruling on the lower court's refusal to instruct the jury as requested by Brandon, and remanded for a new trial. *Brandon v. Molesworth*, 104 Md.App. 167, 655 A.2d 1292 (1995).

Both Brandon and Molesworth filed petitions for certiorari, which we granted. The Maryland Commission on Human Relations, the agency charged with interpreting, administering, and enforcing the Maryland Fair Employment Practices Act, joined as amicus curiae in support of Molesworth. The Maryland Chamber of Commerce and the National Federation of Independent Business, statewide and national agencies that promote small businesses, joined as amici curiae in support of Brandon.

II

Molesworth alleges that in terminating her employment, Brandon violated the public policy announced in § 14 of the Fair Employment Practices Act, Maryland Code (1994 Repl. Vol., 1995 Supp.) Art. 49B:

> *It is hereby declared to be the policy of the State of Maryland,* in the exercise of its police power for the protection of the public safety, public health and general welfare, for the maintenance of business and good government and for the promotion of the State's trade, commerce and manufacturers *to assure all persons equal opportunity in receiving employment* and in all labor management-union relations *regardless of race, color, religion, ancestry or national origin, sex, age, marital status, or physical or mental handicap* unrelated in nature and extent so as to reasonably preclude the performance of the employment, and to that end *to prohibit discrimination in employment by any person, group, labor organization, organization or any employer or his agents.*

(emphasis added). Brandon alleges that since employers with less than fifteen employees are exempted under § 15(b),[2] the public policy announced in § 14 does not apply to those employers. We disagree and hold that, to this extent, the § 15(b) exemption merely excludes small businesses from the administrative process of the Fair Employment Practices Act under the aegis of the Human Relations Commission, but not from the public policy of § 14. The plain language of § 14, the legislative history of Article 49B, and prior decisions of this and other state and federal courts support this conclusion.

A

When she was terminated, Molesworth was an at will employee. "The common law rule, applicable in Maryland, is

---

**2.** Section 15(b) defines "Employer" as "a person engaged in an industry or business who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person."

that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464 (1981). The legislature has "engrafted exceptions" upon that rule, such as Art. 49B, § 16(a)(1) making it unlawful for an employer to discharge an employee "because of ... race, color, religion, sex, age, national origin, marital status, or physical or mental handicap...." *Adler, supra,* 291 Md. 31, 432 A.2d 464. In *Adler,* we recognized a judicial exception to the terminable at will rule: the common law cause of action for wrongful discharge. We held that "Maryland does recognize a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy." [3] *Id.* at 47, 432 A.2d 464.

Generally, a plaintiff must allege violation of a particular statute with some specificity to state a cause of action for wrongful discharge. In *Adler,* the complaint alleged that the plaintiff's discharge "was motivated solely by [the corporation's] desire ... to conceal improprieties and illegal activities which plaintiff might have disclosed...." *Id.* at 34, 432 A.2d 464. The complaint did not, however, state a cause of action for wrongful discharge.

The first source of public policy Adler advanced was a criminal statute. Adler's allegations were "too general, too conclusory, too vague and lacking in specifics to mount up to a prima facie showing that the claimed misconduct contravened" the statute. *Id.* at 44, 432 A.2d 464.

Second, Adler proposed that bribery and falsification of corporate records are so clearly against public policy that he need not identify any particular source. He defined "public policy" as that which is "commonly accepted as necessary to the public good." *Id.* at 43, 432 A.2d 464. Quoting *Md.–Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 605–606, 386

---

**3.** The term "wrongful discharge" encompasses "abusive" and "retaliatory" discharge. *Adler, supra,* 291 Md. at 36, n. 2, 432 A.2d 464.

A.2d 1216 (1978), we declined to adopt such an expansive view of public policy:

> Not being restricted to the conventional sources of positive law (constitutions, statutes, and judicial decisions), judges are frequently called upon to discern the dictates of sound judicial policy and human welfare based on nothing more than their own personal experience and intellectual capacity.... Inevitably, conceptions of public policy tend to ebb and flow with the tides of public opinion, making it difficult for courts to apply the principle with any degree of certainty.

*Adler, supra,* 291 Md. at 45, 432 A.2d 464. "[D]eclaration of public policy is normally the function of the legislative branch." *Id.* at 45, 432 A.2d 464; *see also Finance & Guaranty Co. v. Defiance Motor Truck Co.,* 145 Md. 94, 99, 125 A. 585 (1924) ("[T]he public policy of a state is the policy which its people speaking through their legislature adopt."). We will recognize public policy that is not derived from constitutional or statutory provisions as the basis of a judicial determination "only with the utmost circumspection." *Id.* at 46, 432 A.2d 464, *quoting Patton v. United States,* 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930). Thus, "absent a statute expressing a clear mandate of public policy, there ordinarily is no violation of public policy by an employer's discharging an at will employee...." *Watson v. Peoples Ins. Co.,* 322 Md. 467, 478, 588 A.2d 760 (1991); *see also Ewing v. Koppers Co.,* 312 Md. 45, 537 A.2d 1173 (1988).

## B

We must decide whether § 14 of Art. 49B provides a sufficiently clear mandate of public policy to support Molesworth's common law wrongful discharge cause of action against Brandon. Specifically, we must determine whether the term "employer" in § 14 includes those exempted under § 15(b). "In construing the meaning of a word in a statute, the cardinal rule is to ascertain and carry out the real legislative intention. The primary source of legislative intent is, of course, the language of the statute itself." *Tucker v. Fire-*

*man's Fund Insurance Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986). Ordinarily, therefore, we need not look beyond the plain language of the statute to discover the legislative intention. In other circumstances, however, a statute may be ambiguous and "the entire statutory scheme must be analyzed as a whole." *Outmezguine v. State,* 335 Md. 20, 41, 641 A.2d 870 (1994). In addition, we may need to "consider other 'external manifestations' or 'persuasive evidence,' including a bill's title and function paragraphs, ... and other material that fairly bears on the fundamental issue of legislative purpose or goal...." *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628 (1987).

The Fair Employment Practices Act, Art. 49B, makes certain actions "unlawful employment practices" and creates an administrative procedure for handling discrimination complaints. It is an unlawful employment practice, under Art. 49B, § 16(a)(1), for an "employer ... to discharge any individual ... because of such individual's race, color, religion, sex, age, national origin, marital status, or physical or mental handicap ..." Any person alleging discrimination under § 16(a)(1), or any other section of Article 49B, may file a complaint with the Commission on Human Relations. § 9A(a).

Under §§ 3, 4, 9, 10, 11, and 12, the Commission on Human Relations may receive and issue complaints alleging discrimination, conduct investigations based on complaints received, hold investigative hearings for fact finding, bring civil actions on behalf of complainants for injunctive relief, conduct hearings in cases of failure to reach agreement on the elimination of discriminatory actions, and institute litigation to enforce compliance with the article. *See Weathersby v. Kentucky Chicken Co.,* 86 Md.App. 533, 587 A.2d 569 (1991); *rev'd on other grounds,* 326 Md. 663, 607 A.2d 8 (1992). Molesworth did not file a complaint with the Commission because it was her belief that Brandon is not included within the definition of "employer" in § 15(b) and is, therefore, exempt from this administrative process.

The public policy in § 14, however, by its own language, proscribes discrimination in employment by *"any* employer." (emphasis added). If the term "employer" in § 14 were meant to refer only to employers as defined in § 15(b), the term "any" would be unnecessary. We seek to read statutes "so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Montgomery County v. Buckman,* 333 Md. 516, 524, 636 A.2d 448 (1994). Thus, § 14 applies to "any employer," including those exempted in § 15(b).

Maryland's public policy against sex discrimination is ubiquitous. Section 14 is one of at least thirty-four statutes, one executive order, and one constitutional amendment in Maryland that prohibits discrimination based on sex in certain circumstances. Together these provisions provide strong evidence of a legislative intent to end discrimination based on sex in Maryland. We presume the legislature did not intend to abrogate the common law, absent a clear statement to the contrary. *James v. Prince George's County,* 288 Md. 315, 335, 418 A.2d 1173 (1980). Similarly, where a public policy is as pervasive as Maryland's policy against sex discrimination, we presume the legislature does not intend to allow violations of that policy, absent some indication of a contrary intent. Brandon has provided no proof that the legislature intended to permit employers having less than fifteen employees to discriminate on the basis of sex. On the contrary, the language of the statute indicates that the legislature intended to prohibit sex discrimination by "any employer," consistent with the legislature's general intent to end sex discrimination in Maryland.

The legislative history supports this interpretation. Article 49B was modeled on federal anti-discrimination legislation. Chapter 717 of the Acts of 1965; *Weathersby, supra,* 86 Md.App. at 545 n. 2, 587 A.2d 569. In addition, the title of Chapter 493 of the Acts of 1973, which reduced from twenty-five to fifteen the number of employees in the definition of "employer," indicates that the Act was passed to "generally conform the State Fair Employment Practices Law to the

1972 Amendments of Title VII, Federal Civil Rights Act of 1964." Therefore, in the absence of contrary legislative pronouncements on the Maryland law, we may turn to the legislative history of the federal law to discern the legislative intent behind the § 15(b) exemption. *See Chappell v. Southern Maryland Hosp.*, 320 Md. 483, 494, 578 A.2d 766 (1990).

Amici curiae, the Maryland Chamber of Commerce and the National Federation of Independent Business, correctly identify the concern of many Senators that expanding the scope of the federal law would subject small businesses to expensive lawsuits and potential bankruptcy. *See, e.g.*, 118 Cong.Rec. 2387–89 (1972). They fail, however, to recognize the concern of other members of Congress that expanding the scope of the Act would overburden the Equal Employment Opportunity Commission (EEOC), the federal equivalent of the Human Relations Commission. The EEOC estimated that expanding Title VII to encompass employers with eight or more employees, as originally proposed, would yield a 25% increase in the EEOC's workload. H.R.Rep. No. 92–238, 92d Cong., 1st Sess. (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2142. The minority report of the House Committee on Education and Labor stated:

"Additionally, we fear that, in view of the estimated 18–month to two-year backlog that currently exists at the EEOC, the intent of H.R. 1746 to expand the EEOC's jurisdiction will serve only to retard and frustrate the purposes and objectives of the Equal Employment Opportunity Act. . . .

[T]he massive expansion of jurisdiction and transferring of various programs to the EEOC at a time when the agency is struggling to control a burgeoning backlog of cases, will further hamstring efforts to bring meaningful and timely relief to persons aggrieved by discriminatory employment conditions. . . . [T]he committee bill . . . will thrust the EEOC into an administrative quagmire which can only delay the attainment of a reasonable standard of operational efficiency that Congress should expect and demand."

U.S.Code Cong. & Admin.News 1972 at 2137, 2167, 2176. Therefore, the intent of at least some of the legislators was to exempt small employers from the administrative process under the Act to avoid overburdening the EEOC. It is this intent that is reflected in the language of §§ 14 and 15(b). If the legislature had intended to protect small employers from common law wrongful discharge lawsuits, it would have limited § 14 to employers "as defined in § 15" and it would have preempted the field of employment discrimination, which we have previously held it did not do. *National Asphalt v. Prince George's Co.*, 292 Md. 75, 79, 437 A.2d 651 (1981).

This interpretation is also supported by the case law. In *Kerrigan v. Magnum Entertainment, Inc.*, 804 F.Supp. 733 (D.Md.1992), the court, applying Maryland law, held that a wrongful discharge cause of action for sex discrimination is available against an employer exempted under § 15(b). In that case, the plaintiff alleged her employer discharged her because she was pregnant. The employer argued that there was a "deliberate legislative intent to avoid burdening small businesses with suits alleging discrimination in employment." *Id.* at 735. The court disagreed and said that "while art. 49B exempts small businesses from its burdensome administrative requirements, there is no reason to construe art. 49B as exempting small businesses from its anti-discrimination policy." *Id.* at 736. Likewise, in *Collins v. Rizkana*, 73 Ohio St.3d 65, 652 N.E.2d 653, 660–61 (1995), the Supreme Court of Ohio upheld a wrongful discharge claim based on the public policy in a statute prohibiting discrimination in employment from which the employer was exempt.[4] The legislature's intent, the court said, was "to exempt small businesses from the burdens of [the Chapter], not from its antidiscrimination policy." *Id.* 652 N.E.2d at 660–61. And, in *Bennett v. Hardy*, 113 Wash.2d 912, 784 P.2d 1258 (1990), the Supreme Court of Washington held that a cause of action for wrongful discharge

---

4. While the *Collins* decision rested on multiple sources of public policy, the court found each source to be independently sufficient to support the cause of action. *Collins, supra,* 652 N.E.2d 653.

was available based on a statute prohibiting age discrimination but providing no remedy. The state's anti-discrimination statute, it said, further supported the court's result. Despite the fact that the latter statute exempted the employer from its administrative procedures, it nonetheless, indicated "the Legislature's recognition that retaliatory discharge is an unfair employment practice." *Id.* 784 P.2d at 1264.[5]

The alternative interpretation of the statute advanced by Brandon flies in the face of the view taken by the United States District Court for the District of Maryland which, applying Maryland law, aptly characterized the employer's interpretation: "Bluntly put, [the employer] argues that the General Assembly intended to grant small businesses in Maryland a license to discriminate [on the basis of sex] against their employees with impunity." *Kerrigan, supra,* 804 F.Supp. at 735. Finding no merit in such a contention, *Kerrigan* relied on our decision in *National Asphalt, supra,* 292 Md. 75, 437 A.2d 651, where we held that §§ 14–18 of Art. 49B did not preempt local laws on the same subject. National Asphalt was exempted from the state law because it had less than fifteen employees, but it was covered by a similar county ordinance. *Id.* at 76–77, 437 A.2d 651. When an employee filed a sex discrimination complaint with the Prince George's County Human Relations Commission, National Asphalt sought a declaratory judgment that the county law was preempted by the state law. We held that the county law was not preempted because Article 49B does not comprehensively cover the entire field of employment discrimination. *Id.* at

---

5. The California Supreme Court, in *Jennings v. Marralle,* 8 Cal.4th 121, 32 Cal.Rptr.2d 275, 876 P.2d 1074 (1994), held that the state statute prohibiting age discrimination did not provide a "fundamental policy" to support a wrongful discharge suit because the small employer exemption was inseparable from the statement of policy and because no other statute or constitutional provision prohibited age discrimination. A lower California court, in a sex discrimination case, *Badih v. Myers,* 36 Cal.App.4th 1289, 43 Cal.Rptr.2d 229 (1995), relied on the state constitution to provide the fundamental policy to support the plaintiff's cause of action.

77–78, 437 A.2d 651. "Employers with less than fifteen employees are not permitted by the state statute to discriminate in their employment practices; they simply are not covered." *Id.* at 79, 437 A.2d 651. In order for there to have been a conflict between the state and county laws, the state law would have to permit discrimination by small employers. Since it did not, there was no conflict. *Id.* at 79 n. 3, 437 A.2d 651.

Similarly, in *Coalition v. Annapolis Lodge*, 333 Md. 359, 635 A.2d 412 (1994), Judge Eldridge, for the Court, held that the City of Annapolis had the authority to enact an ordinance prohibiting discrimination by certain clubs that were exempted from the state public accommodations law. The state statute, we said, "does not *permit* discrimination by private clubs. It simply excludes private clubs from the coverage of state law. Instead of constituting an affirmative authorization to discriminate ... [the exemption] merely removes private clubs from the scope of the state public accommodations law." *Id.* at 379, 635 A.2d 412. Thus, Brandon's contention that small employers are exempted from the public policy of § 14 is contrary to our prior holdings that § 14 and a similar statute do not authorize discrimination by exempted businesses.

*Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), and *Chappell, supra*, 320 Md. 483, 578 A.2d 766, do not compel a different result. In *Makovi*, after receiving an unfavorable ruling from the EEOC, the plaintiff filed a suit for wrongful discharge based on sex discrimination. We held that the common law cause of action was not available. Because the employer had a sufficient number of employees, the statute provided the plaintiff with both a right and a remedy. "Thus, the generally accepted reason for recognizing the tort, that of vindicating an otherwise civilly unremedied public policy violation, [did] not apply." *Makovi, supra*, 316 Md. at 626, 561 A.2d 179. A remedy was also available to the plaintiff in *Chappell, supra*, 320 Md. 483, 578 A.2d 766. By contrast, in this case, the state statute does not provide Molesworth with

any remedy.[6]  Thus, the purpose of the wrongful discharge tort, to provide a remedy for otherwise unremedied violations of public policy, is present here and *Makovi* and *Chappell* are inapposite.

## C

We hold, therefore, that Art. 49B, § 14 provides a clear statement of public policy sufficient to support a common law cause of action for wrongful discharge against an employer exempted by Art. 49B, § 15(b).  Section 15(b) merely excludes small employers from the administrative process of the Act, but does not exclude them from the policy announced in § 14.  The General Assembly did not intend to permit small employers to discriminate against their employees, but rather intended to promote a policy of ending sex discrimination statewide.

## III.

■ Brandon requested that the following instruction be read to the jury:

> In cases where the hirer and firer are the same person, there is a strong inference that the discharge from employment was not due to sex discrimination, because it does not make sense that someone would hire a member of a class he does not like, only to discharge that person once he or she is on the job.  Ordinarily a plaintiff alleging sex discrimination will not be able to rebut this inference because of its compelling nature.

> It is undisputed that the person who hired Dr. Molesworth—Defendants Randall Brandon and Defendant Corporation—is the same person who discontinued Plaintiff's employment, knowing Plaintiff to be a female.  You are therefore instructed to apply this inference (that Plaintiff's

---

**6.** We do not decide whether a remedy provided by county ordinance may preempt the availability of a common law cause of action because the issue was not properly raised and briefed below.

noncontinuance of employment was for reasons other than sex discrimination) in evaluating the evidence in this case.

Whether the trial court erred in refusing to so instruct the jury, as the intermediate appellate court held, is the second issue before us. We hold that the trial court properly denied the requested instruction because under federal and state law it is not applicable in a case, as here, involving direct evidence of discrimination. In addition, the instruction was not applicable to the facts of this case and the area of law was fairly covered by the instructions given.

### A

To elucidate our discussion of the "same actor inference" in the requested jury instruction, we must first outline the order and allocation of the burden of proof in a case arising under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U.S.C. § 2000e et seq. (Title VII).[7] The United States Supreme Court, in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), said that where the plaintiff/employee seeks to prove discrimination without the benefit of direct evidence, the employee must first make out a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. at 1824. The elements of the prima facie case depend upon the facts of the case. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. The burden then shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. Finally, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that

7. Molesworth argues that we ought not apply Title VII precedents in common law wrongful discharge cases because to do so would be to engraft an entire body of federal law onto a state common law tort action. Because the sufficiency of Molesworth's evidence was not challenged on appeal to this court, we do not decide whether the United States Supreme Court's Title VII rulings provide the proper burdens of proof in *Adler* cases. The Title VII and ADEA (Age Discrimination in Employment Act) cases we discuss are relevant because the "same actor inference" has only been applied in cases arising under those statutes. In addition, while we do not consider those cases controlling in a common law wrongful discharge suit, they may be instructive.

the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas, supra,* 411 U.S. at 804, 93 S.Ct. at 1825. The employee retains the ultimate burden of proving that the discharge was motivated by discrimination. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093; *Saint Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

## B

The requested jury instruction originated in *Proud v. Stone,* 945 F.2d 796 (4th Cir.1991). In that case, Warren Proud was fired from his job as an accountant in the United States Army after less than five months on the job. Although he had no direct evidence of discrimination, he filed suit under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA), alleging the Army discharged him because of his age. The Court of Appeals affirmed the district court's dismissal at the close of the plaintiff's case. *Id.* at 797. It focused on the fact that the person who fired Proud was the same person who hired him "less than six months earlier with full knowledge of his age." *Id.*

Therefore, in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.

*Id.* This inference, the court said, becomes relevant at the third stage of the *McDonnell Douglas* proof scheme, which is also used in ADEA cases, and "creates a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Id.* at 798.

The United States Court of Appeals for the Eighth Circuit adopted the reasoning of *Proud* in *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173 (8th Cir.1992). *Lowe,* like *Proud,* involved an ADEA claim unsupported by direct evidence and,

like *Proud*, the people who fired Lowe also hired him. The trial court directed a verdict for the employer at the close of the plaintiff's evidence and the Court of Appeals affirmed. *Id.* at 174. While the plaintiff had made out a prima facie case, his evidence was insufficient to prove that the employer's reason for the discharge was pretextual. *Id.* at 175. The court found it "simply incredible, in light of the weakness of plaintiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later." *Id.*

The Sixth Circuit approved the use of a jury instruction on the "same actor inference" in *Buhrmaster v. Overnite Transportation Co.*, 61 F.3d 461 (6th Cir.1995). Mary Buhrmaster sued her former employer under Title VII alleging that sex discrimination motivated the decision to fire her after seven and a half years of work. As was the case in *Lowe* and *Proud*, Buhrmaster had no direct evidence and the same person had hired and fired her. *Id.* at 462, 463. The district court instructed the jury:

> When the individual who hires a person is the same person who fires an employee, there is a strong inference that discrimination did not motivate the employment decision. You may, but are not required to, infer from this evidence that Mr. Littleton's decision to terminate Ms. Buhrmaster's employment was not motivated by sex.

*Id.* at 463. The Court of Appeals ruled that the instruction was applicable in a sex discrimination case and that a short period of time is not an essential element of the inference where the plaintiffs class does not change. *Id.* at 464.

## C

■ We must determine whether the trial court erred in refusing to instruct the jury on the "same actor inference." Parties are "entitled to have the jury fairly instructed upon their theory of the case." *Aleshire v. State*, 225 Md. 355, 370, 170 A.2d 758 (1961); *see also Kennelly v. Burgess*, 337 Md. 562, 574, 654 A.2d 1335 (1995). The court is not required,

however, to read a requested instruction "if the matter is fairly covered by instructions actually given." Maryland Rule 2–520(c); *Kennelly, supra,* 337 Md. at 577, 654 A.2d 1335. Therefore, an appellate court reviewing the denial of a requested jury instruction must determine:

> whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given.

*Wegad v. Howard Street Jewelers,* 326 Md. 409, 414, 605 A.2d 123 (1992) (*quoted in Holman v. Kelly Catering, Inc.,* 334 Md. 480, 495–96, 639 A.2d 701 (1994)).

Under both federal and state law, the "same actor inference" is not applicable in this case because Molesworth presented direct evidence of discrimination. Molesworth testified that when she asked whether she was being fired because she is a woman, Palmer replied, "Yes, that's part of it," and Brandon "nodded in agreement." Brandon's nod was admissible hearsay under Maryland Rule 5–803(a)(2) because it "manifested an adoption" of Palmer's statement. *Brandon, supra,* 104 Md.App. at 198, 655 A.2d 1292. Thus, the nod was a communication by Brandon that part of the reason he fired Molesworth was because she is a woman. Unlike "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself," Brandon's nod was a statement by a decisionmaker relating to the decision itself that tends to show discriminatory intent. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). Such a statement is direct evidence of discrimination. *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1226 (11th Cir.1993); *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990); *see also U.S. Postal Service v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."); *cf. McCormick on Evidence*

§ 185 (John William Strong ed., 4th ed. 1992) [hereinafter *McCormick* ].

The "same actor inference" is only applicable in cases following the *McDonnell Douglas* proof scheme. *See, e.g., Buhrmaster, supra,* 61 F.3d 461; *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *Lowe, supra,* 963 F.2d 173; *Proud, supra,* 945 F.2d 796. The *McDonnell Douglas* proof scheme, however, is inapplicable where the plaintiff presents direct evidence of discrimination. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); *Alton Packaging, supra,* 901 F.2d at 923; *McAdoo v. Toll,* 615 F.Supp. 1309, 1311 (D.Md.1985). Therefore, the "same actor inference" is not applicable in cases involving direct evidence. The United States District Court for the Southern District of Iowa, in an ADEA case, denied the defendant's motion for summary judgment because the plaintiff had direct evidence and there was a question of fact as to whether the same person hired and fired the employee. *Holmes v. Marriott Corp.,* 831 F.Supp. 691, 702 (S.D.Iowa 1993). The plaintiff's evidence included testimony that his supervisor said the plaintiff was "senile," "getting too old to cut it," and "not as young as you used to be." *Id.* at 704. This direct evidence precluded the court from granting the defendant's motion for summary judgment. *Id.* at 703. Research has revealed no case in which a court applied the "same actor inference" where the plaintiff relied on direct evidence. Thus, because Molesworth presented direct evidence of discrimination, under federal Title VII law, the "same actor inference" would not be applicable in this case.

Maryland law of evidence also dictates that the "same actor inference" is not applicable in this case. We have referred to the requested instruction as an "inference" because other courts generally do so. *E.g., Buhrmaster, supra,* 61 F.3d at 463. Actually, the instruction, as requested by Brandon, is a presumption because it shifts the burden of producing evidence. *Tyndall v. National Educ. Centers,* 31 F.3d 209, 215 (4th Cir.1994) (*Proud* creates a "strong presumption of nondis-

crimination."); *cf. McCormick* § 342. After the plaintiff presents evidence sufficient to survive a motion to dismiss, where the same person hired and fired the plaintiff, the presumption dictates that the discharge was not motivated by discrimination. The plaintiff, then, must present further evidence that the discharge was due to discrimination or risk a directed verdict or a jury finding "that Plaintiff's noncontinuance of employment was for reasons other than sex discrimination." *McCormick* § 342.

This presumption is inapplicable under Maryland law in this case because Molesworth presented direct evidence of discrimination. For example, in *Dover Elevator Co. v. Swann,* 334 Md. 231, 638 A.2d 762 (1994), we held that the doctrine of res ipsa loquitur was not applicable where the plaintiff had produced evidence sufficient to prove negligence. Res ipsa was intended to allow a plaintiff to go forward with a case despite the inability to prove negligence. *Id.* at 236–37, 638 A.2d 762. Thus, where a plaintiff is able to prove negligence, the doctrine is unnecessary. *Id.* at 238, 638 A.2d 762. *See also Maszczenski v. Myers,* 212 Md. 346, 129 A.2d 109 (1957). Molesworth's testimony is sufficient to prove discriminatory intent. The presence of direct evidence in this case, therefore, makes a presumption regarding discriminatory intent inapplicable.

In addition, the facts of this case do not warrant the creation of a presumption. *McCormick* summarizes the three primary reasons courts create presumptions.

[J]ust as the burdens of proof are sometimes allocated for reasons of fairness, some presumptions are created to correct an imbalance resulting from one party's superior access to the proof.... A presumption may also be created to avoid an impasse, to reach some result, even though it is an arbitrary one.... Generally, however, the most important consideration in the creation of presumptions is probability. Most presumptions come into existence primarily because the judges have believed that proof of fact B renders the inference of the existence of fact A so probable that it is

sensible and timesaving to assume the truth of fact A until the adversary disproves it.

*Id.* at § 343.

None of these purposes is served in this case by the requested instruction. First, both parties have equal access to the proof. Both Molesworth and Brandon were present at the meeting of July 13, 1990 and both testified regarding Brandon's alleged discriminatory action. Second, there is no impasse we must arbitrarily resolve. A jury is fully capable of evaluating testimony presented at trial. Third, where the same person hires and fires an employee it is not "so probable" that the discharge was not motivated by discrimination that we ought to assume it is so in every case. It is possible for an employer to hire someone only to fire that person later because of their class membership. For example, an employer may develop an aversion to a particular class or an employee may change their class, most obviously age or marital status. Two federal appeals courts rejected the "same actor inference" in ADEA cases because the employer might have hired the employee to work while a younger person was being "groomed" for the job. *Waldron v. SL Industries, Inc.,* 56 F.3d 491, 495 n. 6 (3d Cir.1995); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 548 (8th Cir.1993). Here, it is possible that Brandon fired Molesworth because his clients did not want a female veterinarian. The fact that the discriminatory animus may have originated in the clients makes Brandon no less culpable for discharging Molesworth because of her sex. *Cf.* 29 C.F.R. § 1604.2(a)(1)(iii) (1994); *Diaz v. Pan Am World Airways, Inc.,* 442 F.2d 385 (5th Cir.1971), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). It does, however, provide an explanation for his actions that is contrary to the presumption. Thus, the probability that the discharge was not due to discrimination is not so great as to warrant the creation of a presumption based on the facts before us.

Finally, the trial court properly refused to grant the requested instruction, because the area of law was adequately covered by other instructions. The court instructed the jury

that the plaintiff had to prove by a preponderance of the evidence that the defendant intentionally discriminated against her. The court continued:

> It's not whether or not the trainers discriminated against her.... He is not liable for what they did. It would ... have to be that the Defendant discriminated against her.
>
> ... To find that the Plaintiff was wrongfully discharged, you must find that her termination was motivated by sex discrimination. In other words, the Plaintiff was fired because she was a female.
>
> ... The Plaintiff must prove the Defendant intentionally discriminated [against] the Plaintiff. That is, but for [8] the Plaintiff's gender the Defendant would not have made the decision not to continue the Plaintiff's employment.

These instructions adequately describe the burdens of proof in a sex discrimination case. Thus, even if the requested instruction was legally correct and factually applicable, and would not confuse the jury, the judge may have refused to grant it. *Kennelly, supra,* 337 Md. at 577, 654 A.2d 1335; *Dover Elevator, supra,* 334 Md. at 258, 638 A.2d 762.

Brandon may still have argued to the jury that because he both hired and fired Molesworth they may infer that the discharge was not motivated by discrimination. Our refusal to adopt the "same actor inference" as a presumption in this case does not preclude Brandon from making this argument to the jury. As the court said in *Waldron, supra,* 56 F.3d at 496 n. 6:

---

**8.** The plurality decision in *Price Waterhouse, supra,* 490 U.S. at 240, 109 S.Ct. at 1785, ruled that "[t]o construe the words 'because of' as a colloquial shorthand for 'but-for causation,' ... is to misunderstand them."

> ... Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations. When, therefore, an employer considers both gender and legitimate factors at the time of making a decision, that decision was "because of" sex and the other, legitimate considerations—even if we may say later, in the context of litigation, that the decision would have been the same if gender had not been taken into account.

*Id.* at 241, 109 S.Ct. at 1785.

[W]here, as in *Proud*, the hirer and firer are the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the factfinder that it should not find discrimination. But this is simply evidence like any other and should not be accorded any presumptive value.

*Waldron, supra,* 56 F.3d at 496 n. 6 (quoting brief of EEOC as amicus curiae). The trial court's general instructions also do not prevent Brandon from making more precise arguments to the jury. *Dover Elevator, supra,* 334 Md. at 259, 638 A.2d 762; *Eagle–Picher v. Balbos,* 326 Md. 179, 233, 604 A.2d 445 (1992); *Aronstamn v. Coffey,* 259 Md. 47, 51, 267 A.2d 741 (1970).

## D

We hold, therefore, that the trial court properly refused to instruct the jury that where the same person hires and fires the plaintiff they must infer that the discharge was not motivated by sex discrimination. Such an instruction is not applicable, under federal Title VII law, in a case involving direct evidence of discrimination. Likewise, under Maryland law, the instruction constitutes a presumption which is inappropriate where direct evidence is presented. In addition, none of the purposes for creating presumptions are present on the facts of this case and the area of law was adequately covered by the instructions actually given. Nonetheless, the defendant was free to argue to the jury that since the same person hired and fired the defendant they may infer that the discharge was not due to sex discrimination.

*JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY BRANDON.*