2002 UT 95

**Toby GOTTLING, Plaintiff and Appellee,**

**v.**

**P.R. INCORPORATED, d/b/a Carbmaster and Kelly Peterson, Defendants and Appellants.**

No. 20010324.

Supreme Court of Utah.

Sept. 17, 2002.

Rehearing Denied Dec. 13, 2002.

Robert H. Wilde, Russell A. Denton, Midvale, for plaintiff.

Steven R. McMurray, Bradley L. Tilt, Salt Lake City, for defendants.

HOWE, Justice.

## INTRODUCTION

¶ 1 We granted this interlocutory appeal to decide whether the trial court correctly ruled that an at will employee who claims to have been discriminated against by her employer and who is unable to seek relief under the Utah Anti–Discrimination Act can pursue a civil action for wrongful termination in contravention of an alleged public policy against sex discrimination.

## BACKGROUND

¶ 2 Plaintiff Toby Gottling alleges that her employer, defendant P.R. Incorporated, terminated her because she refused to maintain a sexual relationship with P.R. Incorporated's owner, defendant Kelly Peterson. The Utah Anti–Discrimination Act (UADA or the Act) provides an administrative remedy for discrimination, retaliation, or harassment by an employer on the basis of sex, race, color, pregnancy, age, religion, national origin, or disability. Utah Code Ann. §§ 34A–5–101 to –108 (1999). The remedy is limited, however, to those persons who work for an employer of fifteen or more employees (large employers). *See* Utah Code Ann. §§ 34A–5–102(8)(a)(iv) (defining "employer" for the purposes of the act as a "person employing 15 or more employees within the state for each working day in each of 20 calendar

weeks or more in the current or preceding calendar year"). Because P.R. Incorporated—along with the majority of Utah employers—employs less than fifteen people, Gottling may not look to the UADA for relief from P.R. Incorporated's alleged discrimination. *See Burton v. Exam Ctr. Indus. & Gen. Med.*, 2000 UT 18, ¶ 25, 994 P.2d 1261 (Durham, J., dissenting) (stating that as recently as 1999, 69.7% of Utah employers were small employers).

¶ 3 Seeking an alternative remedy, Gottling brought this action asserting a common law tort cause of action previously unrecognized by this court. Relying on our case law forbidding the termination of an at will employee in contravention of a clear and substantial public policy, Gottling alleged that P.R. Incorporated wrongfully terminated her in contravention of a public policy against sex discrimination. *See Burton*, 2000 UT 18 at ¶ 17, 994 P.2d 1261 (stating that though Utah did not have a public policy against age discrimination, discrimination on account of "sex ... may present different considerations"); *Fox v. MCI Communications Corp.*, 931 P.2d 857, 860 (Utah 1997) (stating that "a public policy whose contravention is achieved by an employment termination must be 'clear and substantial' to be actionable"); *Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1043 (Utah 1989) (recognizing the existence of an action for wrongful termination of an at will employee in violation of a substantial and important public policy).

¶ 4 P.R. Incorporated answered Gottling's complaint by denying her allegations and asserting the affirmative defenses that (1) Gottling's cause of action was preempted by the UADA; (2) Gottling had failed to exhaust her administrative remedies under the UADA; and (3) Kelly Peterson could not be held personally liable for P.R. Incorporated's conduct. Gottling then moved for partial summary judgment and to strike P.R. Incorporated's affirmative defenses. In response, P.R. Incorporated cross-moved for summary judgment, arguing that an action for wrongful termination in contravention of a public policy against sex discrimination does not exist in Utah and that Kelly Peterson could not be held personally liable. After a hear-ing, the trial court ruled in favor of Gottling on all issues. We subsequently granted P.R. Incorporated's petition for interlocutory appeal.

## STANDARD OF REVIEW

■ ¶ 5 "We review a trial court's summary judgment ruling for correctness and afford no deference to its legal conclusions." *Utah Coal & Lumber v. Outdoor Endeavors Unlimited*, 2001 UT 100, ¶ 9, 40 P.3d 581.

## ANALYSIS

¶ 6 P.R. Incorporated contends that Gottling cannot pursue a wrongful termination action based on the contravention of an alleged public policy against sex discrimination because (1) the UADA preempts all common law employment discrimination remedies and (2) Utah does not have a public policy against sex discrimination. P.R. Incorporated also argues that Kelly Peterson cannot be personally liable for the corporation's alleged discrimination. We address each argument sequentially.

### I. PREEMPTION

#### A.

¶ 7 We have long held that "where a conflict arises between the common law and a statute or constitutional law, the common law must yield," *Hansen v. Utah State Ret. Bd.*, 652 P.2d 1332, 1337 (Utah 1982) because "the common law cannot be an authority in opposition to our positive enactments." *In re Garr's Estate*, 31 Utah 57, 68, 86 P. 757, 761 (1906). In fact,

> [t]he rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the statutes of this state. The statutes establish the laws of this state respecting the subjects to which they relate, and their provisions and all proceedings under them are to be liberally construed with a view to effect the objects of the statutes and to promote justice.

Utah Code Ann. § 68–3–2 (1999); *see Retherford v. AT & T Communications*, 844 P.2d 949, 962 (Utah 1992); *Garr's Estate*, 86 P. at

761. Consequently, like an ordinance, the common law is invalid "if it intrudes into an area which the [l]egislature has preempted by comprehensive legislation intended to blanket a particular field." *State v. Hutchinson,* 624 P.2d 1116, 1121 (Utah 1980) (analyzing a statute's preemptive effect on a county ordinance).

¶ 8 Whether legislation is intended to blanket a particular field—and thereby preempt existing or developing common law—is obviously a question of legislative intent. *Richardson v. Matador Steak House, Inc.,* 948 P.2d 347, 350 (Utah 1997). In short, we must decide if the legislature, with its broad law-making power, intended to exercise that power and to occupy the field in such a way as to exclude the contemporaneous application and development of the common law. *See Gilger v. Hernandez,* 2000 UT 23, ¶ 11, 997 P.2d 305. Generally, when answering this question we apply the two-tiered analysis for determining preemptive intent established by the United States Supreme Court.[1] *Id.; Price Dev. Co. v. Orem City,* 2000 UT 26, ¶ 12, 995 P.2d 1237. We recently summarized this analytical framework as follows:

> [i] Sometimes courts, when facing the pre-emption question, find language in the ... statute that reveals an explicit [legislative] intent to pre-empt [common] law. [ii] More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the ... statute's "structure and purpose," or nonspecific statutory language, nonetheless reveal a clear, but implicit, preemptive intent. [a] A ... statute, for example, may create a scheme of [statutory] regulation "so pervasive as to make reasonable the inference that [the legislature] left no room for the [common law] to supplement it." [b] Alternatively, [statutory] law may be in "irreconcilable conflict" with [the common] law. Compliance with both ..., for example, may be a "physical impossibility," or, [c] the [common] law may "stand as an obstacle to the accomplishment and execution of the full purpose and objectives of [the legislature]."

*Gilger,* 2000 UT 23 at ¶ 11, 997 P.2d 305 (quoting *Barnett Bank of Marion County v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996)); *see also Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); 2B Norman J. Singer, *Sutherland Stat. Constr.* § 50:05, at 156 (6th ed. 2001) ("Where common-law principles, associated with the subject matter of a statute, are not expressly affirmed or denied, the extent to which the common law is altered or changed is left to implication."). Thus, where a statute's plain language or its structure and purpose demonstrate a legislative intent to preempt an area of the law, the statute becomes the only source of law in that area, and the development and application of common law principles necessarily ceases.

**B.**

¶ 9 Turning to the UADA, we find that the plain language of section 34A–5–107(15) reveals an explicit legislative intention to preempt all common law remedies for employment discrimination.[2] This section provides: "The procedures contained in this section are the exclusive remedy under state law for employment discrimination based

---

**1.** Both Gottling and P.R. Incorporated center their preemption arguments on the analytical framework we established in *Retherford v. AT & T Communications,* 844 P.2d 949, 964–66 (Utah 1992). *Retherford,* however, provided a very specialized test for determining the preemptive effect "where the statute at issue offers a remedy for a specific type of injury caused by an act of the defendant and where the asserted common law causes of action, while based on the same facts, offer a remedy for a potentially different injury based on those same facts." *Gilger,* 2000 UT 23 at ¶ 10, 997 P.2d 305. Here, we are not faced with a conflict between a specific statutory remedy and a common law remedy for a poten-

tially different injury based on the same facts because the UADA does not offer a remedy to individuals discriminated against by small employers. Consequently, the application of the *Retherford* framework is inappropriate in this situation.

**2.** We note that we were asked to decide whether the UADA preempts common law remedies for employment discrimination in *Burton.* Because we decided that case on another ground, we did not address the issue. *Burton,* 2000 UT 18, 994 P.2d 1261.

upon race, color, sex, retaliation, pregnancy, childbirth, or pregnancy-related conditions, age, religion, national origin, or disability." § 34A–5–107(15). The language of this "exclusivity provision" unambiguously indicates that the UADA preempts "common law causes of action" for employment discrimination based on the "specific grounds" it lists. *Retherford,* 844 P.2d at 961 (holding that the UADA preempts common law causes of action for retaliation).

¶ 10 In declaring the UADA to be the "exclusive remedy under state law for employment discrimination," section 34A–5–107(15) makes no distinction between actions against large and small employers. It might be argued that, as used in this section, the phrase "employment discrimination" refers solely to discrimination by large employers because only large employers are subject to the remedial provisions of the UADA. This argument fails, however, because the UADA does not define the phrase "employment discrimination," and therefore, we must read the phrase literally, according to its ordinary and accepted meaning. *Versluis v. Guar. Nat'l Cos.,* 842 P.2d 865, 867 (Utah 1992) (stating that we must "give effect to each term according to its ordinary and accepted meaning"); *Savage Indus. v. State Tax Comm'n,* 811 P.2d 664, 670 (Utah 1991) (stating that "statutory words are read literally"); *see also Hanchett v. Burbidge,* 59 Utah 127, 135, 202 P. 377, 380 (1921) (stating that when "language is clear and unambiguous, it must be held to mean what it expresses"). Ordinarily, the phrase "employment discrimination" denotes discrimination by an employer, regardless of the employer's size. *See, e.g., Burton,* 2000 UT 18 at ¶ 21, 994 P.2d 1261 (Durham, J., dissenting) (stating that the decision "will apply to all kinds of employment discrimination," referring to the legislature's "broad goal of eliminating employment discrimination" and recognizing a "publicly proclaimed desire to eliminate employment discrimination"). It is in this general sense that the phrase is used in section 34A–5–105(7)(a)(i), where the Anti–Discrimination and Labor Advisory Council is directed to "make recommendations" to the Labor Commission and the Division of Anti–Discrimination and Labor "regarding issues" including "employment discrimination."

¶ 11 We assume that the legislature used the phrase "employment discrimination" advisedly. *See Versluis,* 842 P.2d at 867 (stating that when reading a statute, we presume that "the legislature used each word advisedly"). Elsewhere, the UADA refers to "discriminatory or prohibited employment practices," which are narrowly defined as those activities specified as discriminatory in section 34A–5–106(1)(a) to (f), each of which requires an "employer" within the meaning of section 34A–5–102(8)(a)(iv). *See* § 34A–5–106(1). The legislature could have used the phrase "discriminatory or prohibited employment practices" in section 34A–5–107(15) and thereby have limited the UADA's preemptive effect to common law actions for discrimination against large employers. Nevertheless, it chose to use the undefined, more expansive term. That choice, combined with the use of the word "exclusive" and the lack of any other qualifying language, explicitly reveals the legislature's intent to preempt all other state law causes of action for employment discrimination.

### C.

¶ 12 Even if the UADA lacked an explicit statement of preemptive intent, our holding that it preempts common law remedies for employment discrimination would not change because a clear preemptive intent can be implied from the statute's structure and purpose. The UADA was designed "to prohibit discrimination in employment," and it utilizes a variety of tools to accomplish that goal. *Univ. of Utah v. Indus. Comm'n,* 736 P.2d 630, 636 (Utah 1987). Not only does it create an administrative remedy for those alleging to have been discriminated against by large employers, the UADA also provides a remedy to those discriminated against by employment agencies, labor organizations, and persons who aid, incite, compel, or coerce to commit "discriminatory or prohibited employment practices." § 34A–5–106(1)(b) to (e). In addition, the UADA "creates a substantial bureaucratic system to implement its aims." *Burton,* 2000 UT 18 at ¶ 24, 994 P.2d 1261 (Durham J., dissenting).

It establishes both the Utah Division of Anti–Discrimination and Labor and the Utah Anti–Discrimination and Advisory Council. §§ 34A–5–104 to –105. It delegates the power to receive, investigate, and pass upon complaints. § 34–5–104(2)(b). It directs that the "existence, character, causes, and extent of" employment discrimination be investigated and studied. § 34–5–104(2)(c). It provides for the formulation of plans for elimination of discrimination, the issuance of publications designed to promote good will and eliminate discrimination, and the proposal of legislation designed to eliminate discrimination. "Clearly, the legislature believed the Act's purposes were to have broad and important implications for the welfare of the Utah Workers." *Burton*, 2000 UT 18 at ¶ 24, 994 P.2d 1261 (Durham, J. dissenting); *see also Salt Lake City Corp. v. Confer.*, 674 P.2d 632, 633–34 (Utah 1983). Such a detailed and far-reaching approach to the problem of discrimination, encompassing a wide variety of methods, clearly manifests the legislature's intent to completely blanket the field of employment law in Utah.

¶ 13 In addition to evidencing an intent to preempt the field of employment discrimination law in general, the structure of the statute also shows that the legislature intended its preemption of common law employment discrimination actions to apply to employees of small employers. Despite establishing a comprehensive legislative scheme, including a directive that five representatives of the general public sit on the Anti–Discrimination Advisory Committee, *see* § 34A–5–105(1)(a)(v), the UADA specifically exempts small employers from its administrative remedy. *See* § 34A–5–102(8)(a)(iv). The obvious nature of this category of employers—encompassing a majority of employers in Utah—leaves little doubt that its exclusion was intentional. *See Gilger*, 2000 UT 23 at ¶ 12, 997 P.2d 305 (holding that the Dramshop Act preempted a common law dramshop remedy against social hosts who served their guests only beer because the Act "specifically excluded [this category] from its civil liability provisions" and that "[g]iven the obviousness of this category of providers of beer" it was "obvious" such exclusion was not unintentional). *See* 2B Sing-

er, *Sutherland Stat. Constr.* § 50:05, at 158 (6th ed. 2000)("[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations, and exceptions are minutely described, indicates a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter") (citing *Hammond v. Wall*, 51 Utah 464, 171 P. 148 (1917)). Moreover, the UADA creates an elaborate remedial process requiring that

> [a] covered employee alleging discrimination must assert his claim within 180 days of the alleged discrimination.... The charge is filed at the UADD and is handled administratively. Emphasis in the administrative process is placed on conciliation and voluntary resolution. The UADA mandates that the administrative agency "attempt a settlement between the parties by conference, conciliation, or persuasion." If the claimant is successful, the relief provided includes reinstatement, back pay and benefits, and attorney fees, but no compensatory or punitive damages may be awarded. This is all done without charge by the administrative agency.

*Burton*, 2000 UT 18 at ¶ 17, 994 P.2d 1261 (internal citations omitted). It would be illogical to suppose that the legislature intended to provide the benefit of this timely and cost-effective procedure to large employers while, at the same time, intending to subject small employers to a civil tort action in which they would be vulnerable to a longer statute of limitations, damages, attorney fees and, possibly, a jury trial. Indeed, "it appears ... that the policy reflected in the careful legislative designation of those liable and those not liable under the Act cannot coexist with the imposition by courts of different standards of ... damage exposure for some of those the legislature has decided should not be liable under the Act." *Gilger*, 2000 UT 23 at ¶ 13, 997 P.2d 305. Accordingly, we conclude that the structure and purpose of the UADA clearly exhibits an implicit intent to preempt common law causes of action for employment discrimination by both large and small employers.

¶ 14 The dissent suggests that legislatures are presumed to know the common law in

effect at the time of the enactment of a statute and that absent a signal of legislative intent, the common law should not be preempted. From that principle, the dissent argues that the UADA was intended to "strengthen anti-discrimination law; nowhere does it suggest an intent to weaken or undermine it." *See infra* ¶ 29. However, no common law remedy for employment discrimination existed in Utah prior to the enactment of the UADA in 1969. There was no common law for the legislature to "strengthen" or "weaken" in enacting the UADA.

### D.

¶ 15 Our conclusions regarding the plain language and the structure and purpose of the UADA are bolstered by its legislative history. The original draft of the UADA defined an employer as "every other person employing one or more employees in the State." Utah State House of Rep., 36th Leg., Reading of House Bill 62, February 22, 1965, Record 1 Side 2. After the second formal reading of the bill, the majority of the House was unsatisfied with the bill and returned it to committee. The substitute—and ultimately adopted—bill defined employers as persons "employing twenty-five or more employees." Utah Code Ann. § 34–17–2(5) (1953). This, despite the testimony of one of the drafters of the original bill that the new definition of employer "would create a no man's land between the federal [Civil Rights Act of 1964] and the state law." *See* House of Representatives, Floor Debate on House Bill 62, March 6, 1965, 57th Day, Record 1 Side 2 at 2–4. No other common law remedies for employment discrimination were available at that time in Utah and therefore it is obvious that the legislature deliberately chose to leave individuals employed by small employers without a remedy for employment discrimination.

¶ 16 The available legislative history does not reflect precisely why the legislature ultimately chose to eliminate small employer liability. It does, however, reveal that the UADA was modeled after Title VII of the Civil Rights Act of 1964, which contains a similar exemption for small employers. *See* Utah State House of Rep., 46th Leg., Read-

ing of House Bill 62, March 8, 1965, Record 1 Side 1 (one of Bill's drafters stating the UADA "matches" Title VII); *Id.* at Side 2 (Bill's sponsor stating that the Act "will implement federal [title VII] legislation" in the state context); *see also* Utah State Senate, Floor Debate on Senate Bill 216, February 22, 1985, Record 1 Side 2 (stating that 1985 amendments to the Act reducing the number of people a person must employ to be considered an employer to fifteen was to "bring the state into compliance with federal law"). Congress included the small business exception in Title VII to protect the intimate relationships associated with small employers and to shield them from the heavy costs of defending against discrimination claims. *See* 110 Cong. Rec. S. 13092 (1964) (remarks of Sen. Cotton); 110 Cong. Rec. 13085–88 (June 9, 1964); 110 Cong. Rec. S. 13088 (1964) (remarks of Sen. Humphrey); 110 Cong. Rec. S. 13092–93 (1964) (remarks of Sen. Morse); 110 Cong. R. 6566 (1964); 110 Cong. R. 7212 (remarks of Sen. Clark); *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir.1995) (citing *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir.1993) (stating that small employers are exempted from federal employment discrimination litigation because "Congress did not want to burden small entities with the costs associated with litigating discrimination claims")); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir.1994) (stating that the purpose of exempting small employers is to reduce burden on small businesses); Evan S. Tilton, Note, *Stumbling at the Finish Line: Employment Discrimination and the Utah Supreme Court in Burton v. Exam Center Industrial*, 2000 B.Y.U. L.Rev. 801, 815 (comparing the UADA and Title VII). We have assumed therefore that the small business exception in the UADA was modeled after its federal counterpart and arose from similar concerns about the effect of the UADA on small businesses. *See Burton*, 2000 UT 18 at ¶ 17, 994 P.2d 1261 (recognizing that the reasons for the small business exemption in federal litigation are applicable to the UADA).

### E.

¶ 17 Stating that there was "no controlling authority" on the issue of preemption, the

trial court misinterpreted the plain language and the structure and purpose of the UADA. Instead, relying on a single Maryland Court of Appeals case, *Molesworth v. Brandon,* 341 Md. 621, 672 A.2d 608 (1996), it erroneously suggested that the legislative intent behind the small employer exemption of the UADA was not to preempt the common law but "to avoid overburdening the administrative agency responsible for enforcing the Act." The trial court's reliance on *Molesworth* is misplaced. *Molesworth* is not a preemption case. It addresses preemption only in discussing whether a public policy against sex discrimination existed in Maryland. Whether a public policy exists is an entirely different issue than whether a statute preempts a cause of action. In its discussion of public policy, *Molesworth* does cite a prior preemption case, *National Asphalt Pavement Ass'n v. Prince George's County,* 292 Md. 75, 437 A.2d 651 (1981), in which the Maryland Court of Appeals held that Maryland's equivalent to the UADA did not preempt a preexisting county employment discrimination law. Yet, *National Asphalt* can be distinguished from our holding today because the Maryland statute in question there did not contain an explicit indication of the legislature's preemptive intent and that case deals not with a new common law cause of action, but with a local ordinance that predated the Maryland statute. *Nat'l Asphalt,* 437 A.2d at 651.

¶ 18 Aside from the fact that *Molesworth* does not directly address preemption, the trial court's reliance on that case to suggest that the small employer exemption of the UADA was meant to avoid administrative backlog is problematic because in our view *Molesworth* is of questionable authority on this point. The *Molesworth* court's pronouncements regarding the intent of the Maryland legislature are relevant, if at all, only to a determination of the preemptive effect of the UADA insofar as they address the congressional intent behind Title VII of the Civil Rights Act of 1964, which we have recognized as a model to the UADA. In determining that the purpose of the small employer exemption in the Maryland equivalent to the UADA was to avoid a heavy administrative burden, *Molesworth* looks to a single U.S. House of Representatives committee minority report prepared in conjunction with the 1972 amendments to the Civil Rights Act of 1964 and concludes that "the intent of at least some of the legislators [involved in the 1972 amendments] was to exempt small employers from the administrative process under the Act to avoid overburdening the EEOC." *Molesworth,* 672 A.2d at 614. In so concluding, it ignored other history of the 1972 amendments that "identif[ies] the concern of *many Senators* that expanding the scope of the federal law would subject small businesses to expensive law suits." *Id.* at 633 (emphasis added). More importantly, it ignores the ample congressional history and many cases, cited above, which detail the intent of Congress in including a small business exemption in the original federal Act passed in 1964. These sources convincingly demonstrate that the primary purpose of the small business exception was to avoid burdening small employers. *See infra* ¶ 16.

¶ 19 *Molesworth* relied on *Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653 (1995), a case cited by Gottling, where despite a statute similar to the UADA, the Ohio Supreme Court recognized a common law cause of action for sex discrimination. Like *Molesworth,* however, *Collins* is fundamentally a policy case, not a preemption case. It addresses the subject of preemption only in its discussion of whether Ohio enjoyed a public policy against sex discrimination. In stating that the Ohio equivalent to the UADA did not preempt common law remedies, the Ohio Supreme Court expressly relied on its earlier decision in *Helmick v. Cincinnati Word Processing, Inc.,* 45 Ohio St.3d 131, 543 N.E.2d 1212 (1989). *Helmick* can be distinguished because there the Ohio Supreme Court found there was nothing in the "language or legislative history of [the Ohio Anti–Discrimination statute] barring the pursuit of common-law remedies for injuries out of sexual misconduct." *Id.* at 1215. Further, the actions discussed in that case were not employment discrimination actions, but those for intentional and negligent infliction of emotional distress, assault and battery, invasion of privacy, defamation of character and tortious interference with and breach of their employment contracts. *Id.* at 1212. Further still,

though *Collins* did not address the issue, its assertion that the Ohio statute did not preempt common law employment discrimination actions appears directly at odds with a statement in *Helmick* that the Ohio statute "does provide the exclusive remedy for pure employment discrimination claims." *Id.* at 1216. For all of these reasons, the trial court erred by relying on *Molesworth* to support its determination that the UADA did not preempt common law causes of action for employment discrimination.

¶ 20 In its ruling, the trial court also suggested that the legislature could not have meant to preempt common law actions against small employers because it would be "inequitable" to find that "small employers are granted a license to discriminate and their employees have no recourse available to them." However, the " 'legislature need not "strike at all evils at the same time," *Semler v. Dental Examiners*, 294 U.S. 608, 610, [55 S.Ct. 570, 571, 79 L.Ed. 1086], and ... "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L.Ed. 563].' " *Greenwood v. City of North Salt Lake*, 817 P.2d 816, 821 (Utah 1991) (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966)). Moreover, new statutory schemes, in certain circumstances, may preclude formerly available common law causes of action, despite leaving some individuals without a remedy. *See, e.g., Gilger*, 2000 UT 23 at ¶ 13, 997 P.2d 305 (holding that the Dramshop Act preempted a common law dramshop remedy against social hosts who served their guests only beer, even though the Act did not provide an alternative remedy); *see also Masich v. United States Smelting, Ref. & Mining Co.*, 113 Utah 101, 126, 191 P.2d 612, 624–25 (1948) (upholding legislation abrogating a common law right to recover for work-related injury). In this case, the legislature has not taken away an existing right, but has simply indicated its intent to preempt the creation of a new one.

### F.

¶ 21 We hold therefore that because the UADA preempts all common law causes of action for discrimination, retaliation, or harassment by an employer on the basis of sex, race, color, pregnancy, age, religion, national origin, or disability, the trial court erred by recognizing a common law cause of action against a small employer for wrongful termination in contravention of a public policy against sex discrimination.

### II. PUBLIC POLICY

¶ 22 P.R. Incorporated also argues that Gottling cannot pursue a wrongful termination claim based on the contravention of a public policy against sex discrimination because Utah does not have a public policy against gender discrimination. In *Burton*, we acknowledged that a "public policy against discrimination on grounds [of sex] might conceivably be found in [the] statutes of this state." *Burton*, 2000 UT 18 at ¶ 17, 994 P.2d 1261. However, our decision that the UADA preempts all common law remedies for employment discrimination renders unnecessary a discussion and determination of that question.[3] Even if a public policy against sex discrimination exists, it would not allow Gottling to bring a common law tort action against P.R. Incorporated. We therefore express no opinion on the matter.

### III. PROPER EXERCISE OF JUDICIAL POWER

¶ 23 This court is no friend to employment discrimination. Nevertheless, we recognize that our decision today leaves many Utah workers unable, should the need arise, to obtain relief from employment discrimination. As a result, some will undoubtedly accuse this court of opening the door for small employers in Utah to discriminate. Those who do so ignore the reality that it is the legislature that primarily holds the power to open and shut that door. Indeed, "[t]his court cannot ignore or strike down an act because it is either wise or unwise. The wisdom or lack of wisdom is for the legislature to determine." *Masich*, 113 Utah at

---

3. Our decision also renders unnecessary discussion of Kelly Peterson's personal liability.

126, 191 P.2d at 625. We need not "agree with [the legislature] as a matter of public policy.... What the legislature 'should' do is not the question. Rather it is what the legislature has done." *Gilger,* 2000 UT 23 at ¶ 13 & n. 5, 997 P.2d 305. Having determined what the legislature has done,

> respect for the legislative prerogative in lawmaking requires that the judiciary not interfere with enactments of the Legislature where disagreement is founded only on policy considerations and the legislative scheme employs reasonable means to effectuate a legitimate objective. In matters not affecting fundamental rights, the prerogative of the legislative branch is broad and must by necessity be so if government is to be by the people through their elected representatives and not by judges.

*Baker v. Matheson,* 607 P.2d 233, 237 (Utah 1979). Simply put, we must not craft a remedy where the legislature intends no remedy to exist. To do otherwise trespasses upon the legislative domain and threatens the fragile balance of power upon which our system of government rests. As with other things, if the UADA "is unjust, amendments to correct the inequities should be made by the legislature and not by judicial interpretation." *Masich,* 113 Utah at 101, 191 P.2d at 625. Those who desire to effectuate a change in Utah employment law should center their efforts on the legislative branch, whose purpose and duty it is to represent the voice of the people in determining the law of this state. Until the law is changed, this court must enforce it as it is now written, whether we agree with it or not.

## CONCLUSION

¶ 24 The Utah Anti–Discrimination Act preempts all common law remedies for employment discrimination on the basis of race, color, sex, pregnancy, age, religion, national origin, or disability. Therefore, Gottling may not bring a cause of action for wrongful termination in contravention of an alleged public policy against sex discrimination. The summary judgment of the trial court is reversed, and the complaint is dismissed for failure to state a cause of action.

¶ 25 Associate Chief Justice DURRANT, Justice RUSSON, and Justice WILKINS concur in Justice HOWE's opinion.

DURHAM, Chief Justice, dissenting.

¶ 26 I respectfully dissent.

¶ 27 Oliver Wendell Holmes noted that the law is a "magic mirror" reflecting "not only our own lives, but the lives of all men that have been." Oliver Wendell Holmes, Jr., *The Speeches of Oliver Wendell Holmes* 17 (1891). The law thus reflects the myriad changes that occur in society, and strives, however imperfectly, to make the world more just. The Utah Legislature acknowledged profound societal changes when it passed the Utah Anti–Discrimination Act. Responding to the deep revulsion felt by the majority of our citizens to unfair employment discrimination, the Act made such practices actionable in a fast, relatively cheap, and efficient way. The majority opinion draws the illogical conclusion that, in providing statutory remedies for employees of large employers (employers of fifteen or more employees), the legislature preemptively eliminated all common law employment discrimination remedies for all other employees. I disagree.

¶ 28 The anti-discrimination statute provides administrative procedures for all employment discrimination claims arising at larger employers. This statutory scheme is *silent* regarding all other employees who constitute the majority of Utah workers. The majority of this court infers from this silence the conclusion that the legislature legitimized employment discrimination against all employees of small businesses, including Ms. Gottling, who was allegedly fired by her employer for refusing his sexual demands.

¶ 29 Traditionally, the legislature may change the common law only explicitly. *Fed. Sav. & Loan Ins. Corp. v. Quinlan,* 678 F.Supp. 174, 176 (E.D.Mich.1988). "The legislature is presumed to know the common law which existed before the enactment of a statute, and 'absent an indication that the legislature intends a statute to supplant common law, the courts should not give it that effect'" (quoting Norman J. Singer, *Sutherland Stat. Constr.* § 50.01, at 422 (4th

ed.1984)); *see also Tucson Gas & Elec. Co. v. Schantz*, 5 Ariz.App. 511, 428 P.2d 686, 690 (Ariz.1967); *Hechter v. N.Y. Life Ins. Co.*, 46 N.Y.2d 34, 412 N.Y.S.2d 812, 385 N.E.2d 551, 554 (1978).[4] This principle of interpretation is particularly important here where major public policies such as anti-discrimination are concerned. If the legislature wishes to make sexual harassment lawful for the employers, it knows how to do so. On its face, this statute is intended to *strengthen* anti-discrimination law; nowhere does it suggest an intent to weaken or undermine it. The majority's assumption to that effect is distressing in its implications.

¶ 30 In my view, the legislature intended by the Act to establish simplified procedures and more certain remedies for unlawful discrimination by bigger businesses. That goal is inconsistent with the conclusion that the legislature sub silencio repealed and eliminated existing common law remedies for employees who happen to work for smaller employers. The majority's position implicitly concludes that the legislature in fact intended the statute to weaken employment anti-discrimination law, rather than strengthen it. I am not prepared to accept that conclusion.

¶ 31 The legislature created a "package deal" affecting employees of larger firms. The trade-offs included in the package, not unlike those contained in the workers' compensation scheme, are clear: In return for losing access to common law remedies (some of which were unorganized, under-developed, or uncertain during this period), employees could use a simple, relatively certain, statutory procedure for redressing discriminatory practices. Presumably, the legislature did not extend the Act to smaller employers out of concern that they might be financially unable to meet the costs of creating the sorts of hiring and promotion policies that are the most effective way of avoiding anti-discrimination lawsuits. Moreover, it is reasonable to make it easier to sue and recover from an entity which has greater monetary resources, especially because large, visible corporations are more likely to serve as an example than smaller enterprises. But there is no reason to infer from the fact that the legislature *strengthened* anti-discrimination remedies against large employers that it simultaneously intended to destroy or preclude existing and future remedies against small employers.

¶ 32 The majority opinion states that the phrase "employment discrimination" is not defined in the statute and therefore must include discrimination by small firms. *See* Utah Code Ann. § 34A–5–107(15) (2001). This is incorrect. The statute explicitly states that it applies only to employers with fifteen or more employees. This is a limiting definition of employment discrimination: The statute simply does not speak to discrimination by small employers.

¶ 33 In *Burton* this court decided the common law issue of whether age discrimination could be the basis for a claim for tortious wrongful termination for employees of small employers on grounds other than the UADA's alleged exclusivity. *Burton v. Exam Ctr. Indus. & Gen. Med. Clinic, Inc.*, 2000 UT 18, ¶¶ 10–12, 994 P.2d 1261. Had the UADA applied, there would have been no reason to do a public policy analysis. The legislature's "broad goal of eliminating employment discrimination" supports the common law remedy plaintiff seeks here. *Burton* at ¶ 25 (Durham, J., dissenting). It is the "important and substantial public policies" involved in eradicating the scourge of employment discrimination from our society that point to the legislature having no intent to weaken the very rights of Utah workers they have sought to protect. *See Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1042 (Utah 1989). Today's decision announces the principle that the majority of Utah workers have *no remedy* whatsoever, statutory or common law, against their employers for discrimina-

4. In a recent decision we stated that courts may look to statutory "structure and purpose" to find "implicit, pre-emptive intent" of the common law when the statutory regulation is "so pervasive," is in "irreconcilable conflict" with the common law, or when the common law "stand[s] as an obstacle to the accomplishment … of the full purposes and objectives of [the legislature]." *Bishop v. GenTec Inc.*, 2002 UT 36, ¶ 9, 48 P.3d 218 (citations omitted and internal quotations omitted). The Utah Anti–Discrimination Act is not "so pervasive" to warrant such a discussion since it covers *only* employees of businesses with fifteen or more employees, and neither is the common law in "irreconcilable conflict" or an "obstacle" to the statutory scheme.

tion on the basis of race, color, sex, pregnancy, age, religion, national origin, or disability. I cannot agree that the legislature either intended this result or accomplished it in the Utah Anti–Discrimination Act. Such a result violates basic notions of fairness and human dignity. Furthermore, as I noted in my dissent in *Burton:*

> [T]he way in which a state regulates relations between employees and employers has a significant impact on the quality of life for many of its citizens, and ultimately for the society as a whole. The "workplace climate" of a state is an important part of its opportunities for economic growth and long-term development. It is an entirely appropriate arena for the operation of policy choices intended to benefit the public interest, as indeed is manifest by the legislature's choice to embody anti-discrimination principles in [the] statute. Utah should not be a place where workers can be fired, paid less, or otherwise treated less favorably by nearly 70 percent of all employers on the basis of their race, sex, religion, disability, or age.

*Burton,* 994 P.2d 1261, 2000 UT 18 at ¶ 25 (Durham, J., dissenting).